[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 18, 2003
THOMAS K. KAHN
CLERK**

————————————————

No. 02-16424

————————————————

D. C. Docket No. 01-00009-CV-JTC-3

PETER EVANS,
DETREE JORDAN,

Plaintiffs-Appellees,

versus

CITY OF ZEBULON, GA,
ROBERT LOOMIS, individually and
in his official capacity as Police
Chief of the City of Zebulon, GA,

Defendants,

DENIS STEPHENS,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

**(November 18, 2003)**

Before ANDERSON and BIRCH, Circuit Judges, and PROPST[*], District Judge.

ANDERSON, Circuit Judge:

Officer Denis Stephens, of the Zebulon, Georgia, police force, appeals the district court's order denying his motion for summary judgment on the basis of qualified immunity. Plaintiffs-appellees Peter Evans and Detree Jordan contend in their action under 42 U.S.C. § 1983 that Stephens unconstitutionally subjected them to a strip search and body cavity search after arresting them on January 22, 1999, and that Stephens conducted the searches in an abusive and unreasonable manner.

## I.  BACKGROUND

### A.  Factual Background[1]

On the evening of January 22, 1999, Peter Evans and Detree Jordan were driving from Atlanta to Statesboro, where the two were students at Georgia Southern University. Evans was the driver and Jordan the passenger of the vehicle,

---

[*]  Honorable Robert B. Propst, United States District Judge for the Northern District of Alabama sitting by designation.

[1]  Because this is a review of a the denial of a motion for summary judgment by the appellant, we will recount the facts favorably to the appellees. Rodriguez v. Farrell, 280 F.3d 1341, 1343 n. 1 (11th Cir. 2002). The facts recounted here are drawn primarily from the district court's order and the deposition testimony of the appellees.

which was a rental. Both are black males in their twenties. The two got lost, mistakenly traveling south on Interstate 85 towards Columbus rather than Interstate 75, which leads to Macon and Interstate 16, which in turn leads southeast to Statesboro. When they realized their mistake, Evans and Jordan pulled off the highway to a gas station and got directions to Macon via secondary highways, cutting east across middle Georgia.

At approximately 8 o'clock that evening, Zebulon Police Officer Denis Stephens clocked Evans's and Jordan's car traveling 72 m.p.h. in a 45 m.p.h. zone. Stephens pulled the car to the side of the road[2] and asked Evans about their destination. After hearing Evans's explanation of where he and Jordan were going and how they got where they were, Stephens ordered the men to exit the car. Evans consented to a search of the car and to a pat down. Stephens searched the car for about five minutes. On the video tape, Stephens later says that he found a beer can in the car but he did not display any can in front of the video camera, though it was Stephens's usual habit to display such items. Evans and Jordan assert that Stephens did not, in fact, find a beer can. Several times during the course of the traffic stop, Evans put a piece of candy in his mouth. Each time, Stephens asked him to remove

_____

[2] The subsequent traffic stop was captured by a video recorder in Stephens's patrol car.

it.

Stephens issued Evans a citation for speeding. He then asked Evans to submit to a chemical analysis of the alcohol content in his breath. Evans replied that he wanted to speak to his lawyer, and Stephens placed Evans under arrest for D.U.I. refusal and for speeding. Stephens requested computer checks of the men and their vehicle. The check returned an outstanding parole violation warrant for a black male with the last name "Jordan" and a birthday matching that on Jordan's license. Based on these matches, Stephens placed Jordan under arrest for violating parole.[3] During a pat down of Jordan, Stephens says that he found a beer pop top. The pop top is not visible in the tape and Stephens did not display it for the camera. As with the alleged beer can, Evans and Jordan claim Stephens did not in fact find a pop top.

Stephens placed Evans and Jordan in his patrol car and a tow truck was summoned. While waiting for the tow truck, Stephens again searched the interior of the car and the trunk. He and the other officers also searched the ground and roadside around the rental car. When the tow truck arrived, Stephens transported Evans and Jordan to the Pike County Jail.

At the jail, Stephens handcuffed Evans and Jordan to a bench outside of the

---

[3]      It would later turn out that the warrant was for a different man.

4

booking area while he spoke with Pike County Sheriff's Deputy Andre Dawson, who was staffing the booking area. Stephens then took Jordan into a utility closet and pushed him up against the wall, telling him to keep his hands on the wall. Stephens patted Jordan down and then ordered him to remove his shoes and shirt. Stephens searched those articles of clothing and ordered Jordan to place his hands back against the wall. He then ordered Jordan to lower his pants. When Jordan turned around and protested that this was unnecessary, Stephens placed Jordan in a choke hold and pushed him back against the wall. At this point another officer pushed Evans into the room, causing him to stumble into Jordan, and both men fell to the ground.[4] The officers picked the men up and pushed them back against the wall. Stephens struck Jordan in the side with a slender black object,[5] and the other officer placed Jordan in a choke hold and held him against the wall. Stephens then pulled Jordan's underwear down and placed the slender black object between Jordan's buttocks, jabbing his anus. Jordan, startled, jumped, and the officers laughed and giggled. Stephens ordered Jordan to use his hands to spread his

---

[4] Jordan's testimony indicates that Evans was pushed into the room after Stephens ordered Jordan to lower his pants. Evans's testimony indicates that he was pushed into the room before Stephens issued this order. This discrepancy in the appellees' deposition testimony does not affect our analysis of this appeal.

[5] The object was possibly a baton or a flashlight. Evans and Jordan could not identify it.

buttocks.[6] Stephens repeated these actions on Evans, placing the object between his buttocks, then used it to lift each man's genitals.[7] Stephens then ordered the men to replace their clothing, clapping and counting to hurry them. Jordan and Evans were rushed back to the booking area before they were able to put their shoes and shirts back on. During the strip search and cavity search, Stephens made racially derogatory remarks and, while using the slender metal object on the two men, referred to prison rape.[8]

Evans and Jordan were issued jumpsuits and placed in the general population

---

[6] Jordan testified that Stephens "came back with a cold black object. I remember him placing it on me, he jugged me one time on my left cheek, then he stuck me in my anus, then he jumped and laughed and giggled. He looked at the other officer, they laughed and giggled at me when I jumped from the cold black object." Jordan Depo. Tr. at 16.

Evans testified that "I remember him taking a stick, he was talking to me, telling me to keep my hands on the wall. He took that whatever it was, he went in Detree's ass, open it up, he told Detree to take his hands and spread his butt cheeks." Evans Depo. Tr. at 15.

[7] Jordan testified that "I looked to my right and I seen the same thing happen to Mr. Evans." Jordan Depo. Tr. at 16-17. Evans testified that "he came on me, told me to spread my cheeks. He stick [sic] the stick in my ass. I let go like this, I jumped up, he got real mad . . . At this point in time, he told me, us, to turn around and put our arms out like this . . . He took the object, he picked Detree's testicles up with the stick, lifting his testicles up with that thing . . . Then he put the stick over there on me. He got back in Detree's, he moved my testicles with the stick, looked, did like this. They was giggling and laughing, not so tough, is he, not so tough." Evans Depo. Tr. at 16-17.

[8] Jordan testified in his deposition that Stephens was "saying comments like I am going to send you boys to prison, y'all are going to get butt fucked up the ass. I am going to send y'all up the road for a long time, boy." Jordan Depo. Tr. at 17. Evans testified that Stephens was "saying you better get used to this, this is how it is in the big house, this is where you getting ready to go. Somebody is going to be butt fucking you for the next 20 years, all because you got a smart mouth." Evans Depo. Tr. at 16-17.

overnight.  The next morning Jordan was released, and he returned to post bail for

Evans.  Evans later pled guilty to reckless driving and the D.U.I.-related charges

were dropped.  Evans and Jordan testified that they have not suffered any physical

injuries as a result of the incident, and neither testified that the slender object used

by Stephens penetrated his rectal cavity.  Both testified that they now suffer from

periodic anxiety, insomnia, and depression.[9]

B.  Procedural History

Evans and Jordan filed suit under 42 U.S.C. § 1983 against Officer Stephens,

the chief of the Zebulon Police Department, and the city of Zebulon, alleging

violations of their Fourth Amendment rights to be free from unreasonable searches

and seizures based on their arrests and the subsequent searches.  All defendants

moved for summary judgment, which the district court granted to the city and to the

police chief.  The district court granted Stephens's motion for summary judgment

on the arrest claim, finding that Stephens had probable cause to arrest Evans for

---

[9]      Stephens offers a tamer version of the events at the jail.  In his account, the searches occurred separately rather than simultaneously, took place in a cell across from the booking area, and consisted of Evans and Jordan compliantly removing their outer clothing and pulling down their underwear for a visual inspection of their front and back.  Stephens testified that no contact occurred, no body cavity inspections took place, and that he did not say anything about prison rape.

speeding and had probable cause to arrest Jordan for a parole violation.[10]

The court denied Stephens's motion for summary judgment on the search claim, holding that the plaintiffs had alleged an unconstitutional search, conducted without reasonable suspicion and in an unconstitutionally intrusive manner. The court held that Stephens was not entitled to qualified immunity for the search as alleged. The court held that Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861 (1979), and Justice v. City of Peachtree, 961 F.2d 188 (11th Cir. 1992), clearly established that, absent reasonable suspicion, a strip search involving physical contact and use of an object to probe the subject's anal and genital areas was unconstitutional. Stephens brings this interlocutory appeal challenging the district court's denial of his motion for summary judgment, arguing that the appellees have not stated a violation of their constitutional rights and that he is entitled to qualified immunity. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985);

---

[10] The plaintiffs-appellees have not cross-appealed the district court's judgment in favor of Stephens on the arrest claim; and their cross-appeals of the judgments in favor of the city and the police chief were dismissed by order of this court on February 6, 2003, for lack of finality (i.e., lack of appellate jurisdiction). See Hudson v. Hall, 231 F.3d 1289, 1293-94 (11th Cir. 2000). Therefore, the only issues before us relate to Stephens's interlocutory appeal of the district court judgment holding that the searches were unconstitutional and that Stephens was not entitled to qualified immunity.

As a result of this opinion, judgment will be entered for Stephens, which apparently will render final the judgments in favor of the city and the police chief. If plaintiffs desire to appeal those judgments, they should file a new and timely notice of appeal.

8

Dalrymple v. Reno, 334 F.3d 991 (11th Cir 2003) (allowing interlocutory appeal of denial of qualified immunity).

## II. STANDARD OF REVIEW

We review a district court's order denying summary judgment de novo. Wilson v. Jones, 251 F.3d 1340, 1342 (11th Cir. 2001). We must first decide whether the plaintiffs have alleged a constitutional violation and, if so, whether the constitutional right alleged to have been violated was clearly established at the time of the alleged violation. Id. (citing McElligot v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999)). A government official is entitled to qualified immunity for liability arising out of his discretionary actions unless those actions violated a clearly established federal right of which a reasonable person would have known. Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982)).

The Supreme Court has recently articulated the appropriate standard: "the salient question ... is whether the state of the law ... [at the relevant time] gave the ... [officers] fair warning that their alleged treatment of Hope was unconstitutional." Hope, 536 U.S. at 741, 122 S. Ct. at 2516. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."

Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156 (2001).

## III.  DISCUSSION

This appeal presents two questions regarding the legality of the searches. The first is whether the strip search was justified in its inception, and the second is whether the search was conducted in a constitutional manner.  Each question also raises the issue of qualified immunity.  We will address the inception of the search first.

### A.  Inception of Search

Arrestees who are to be detained in the general jail population can constitutionally be subjected to a strip search only if the search is supported by reasonable suspicion that such a search will reveal weapons or contraband. Wilson, 251 F.3d at 1343.  Stephens argues that he had reasonable suspicion to believe that Evans and Jordan were concealing drugs.  We conclude, however, that these searches were not supported by reasonable suspicion.

Stephens advances a myriad of factors that, he argues, support a reasonable suspicion that Evans and Jordan were concealing drugs beneath their clothing or in their body cavities, but none of these factors, alone or in combination, provide such

reasonable suspicion. Stephens's arguments boil down to the following: two young men were speeding through rural Georgia in a rental car in the evening and, when stopped by law enforcement officials, appeared nervous and claimed to be lost.[11] These factors are not sufficiently indicative of drug activity to support more than "an inchoate and unparticularized suspicion or hunch" that they were concealing drugs.[12]  Brent v. Ashley, 247 F.3d 1294, 1300 (11th Cir. 2001) (quoting United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585 (1989)).

The instant facts are insufficient to permit a strip search involving contact with the anus and genitals.  The justification required to conduct a search increases with the degree of intrusiveness of a search, see Justice, 961 F.2d at 192, and the scope of the search must be commensurate with the officer's reasonable suspicions, see Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878 (1968).  Cf. Justice, 961 F.2d at 194 (reasonable suspicion to strip search an arrestee in custody was

_____

[11]    Stephens also argues that the beer can found in the car and pop top found in Jordan's pocket support his suspicion of drug activity.  As noted, the appellees contest whether Stephens actually found these items, and we accept their version of the facts for purposes of this appeal.

[12]    We note that although Stephens has argued that drug couriers sometimes use rental cars, he has not argued that the appellees fit any drug courier profile, that they were traveling on a drug trafficking route, or that the characteristics of the appellees matched, in his law enforcement experience, characteristics typical of a drug offender.  We also note that, although Stephens claims that he found the appellees' explanation about being lost "suspicious," he is unable to articulate why that explanation is suspicious.

11

supported by: reasonable suspicion of regular drinking and drug activity in the area; officer saw driver of vehicle hand something to the girl searched; the girl appeared extremely nervous; the officer thought females were more likely to conceal drugs on their person; this girl had a friend whose mother suspected that they were using drugs, and based on their training and experience and these circumstances the officers suspected that the girl was concealing what the driver handed her and that it was drugs); Kraushaar v. Flanigan, 45 F.3d 1040, 1046 (7th Cir. 1994) (reasonable suspicion to strip search an arrestee supported by furtive hand movements suggesting an attempt to hide contraband in his pants); Bell, 441 U.S. at 559, 99 S.Ct. at 1884 (noting documented attempts by inmates to smuggle contraband into prison facilities by concealment in a body cavity).  In contrast to the cited cases, Stephens observed no behavior by the appellees consistent with an attempt to hide anything beneath their clothing during or after the traffic stop, and the appellees, who presumably did not anticipate being arrested that night, had no apparent motive at the time of the traffic stop to conceal contraband underneath their clothing for smuggling into the jail.

The record also reveals that both Evans and Jordan were subjected to a pat-down search at the scene of the traffic stop and again when they arrived at the jail. Stephens conducted two searches of the car during the traffic stop, and he and the

other officers at the scene conducted a thorough search of the ground and roadside around the car. These searches revealed, at most, a beer can and a pop top. Viewing the facts in the light most favorable to the appellees, these searches revealed nothing. As we have noted in the border inspection context, increasingly thorough searches that fail to reveal contraband or incriminating evidence tend to dispel reasonable suspicions, not heighten them. See Brent, 247 F.3d at 1301; cf. Skurstenis v. Jones, 236 F.3d 678, 682 (11th Cir. 2000) (firearm found in an arrestee's car provided reasonable suspicion that she might be concealing weapons underneath her clothing).

Stephens is entitled to qualified immunity, however, because as of January 22, 1999, the law was not clearly established that an arrestee could not constitutionally be strip searched under the conditions alleged. In Wilson, we granted qualified immunity to a Shelby County, Alabama, sheriff for his security policy of strip searching all arrestees detained in the general jail population, regardless of the presence or absence of reasonable suspicion that an arrestee concealed weapons or contraband. We held that Bell and Justice did not clearly establish that reasonable suspicion was required to perform those searches. 251 F.3d at 1344-46. Because the law was unclear until 2001 when Wilson was decided, Stephens did not have fair warning in 1999 that reasonable suspicion was

required to conduct a strip search or body cavity search of an arrestee detained in the general jail population.  Therefore, Stephens is entitled to qualified immunity for initiating these suspicion-less searches.[13]

B.  Manner of the Search

The appellees also asserted that the manner in which the searches were conducted violated their constitutional rights.  In Bell, the Supreme Court explained that

> [t]he test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. at 559, 99 S.Ct. at 1884.  The highly intrusive nature of strip searches and body cavity searches is widely recognized, fraught as they are with the inherent potential to degrade, demean, dehumanize, and humiliate.  Justice, 961 F.2d at 192.  There is a danger that the search will be conducted in "an abusive fashion."  Bell, 441 U.S. at 560, 99 S.Ct. at 1885.  "Such an abuse cannot be condoned.  The search must be conducted in a reasonable manner."  Id.

Courts considering the reasonableness of the manner in which strip searches

---

[13]    The fact that Stephens may have thought that he had reasonable suspicion does not affect the qualified immunity analysis, which is an objective inquiry.  Lassiter, 28 F.3d at 1150.

14

and body cavity searches of arrestees and prison inmates are conducted have looked at factors including the degree of privacy afforded the person subjected to the search, whether the search was performed by someone of the same sex as the person searched, the hygienic conditions of the search, whether the search involved physical contact, and whether the search was performed in a professional manner.[14] See, e.g., Leverette v. Bell, 247 F.3d 160, 168 (4th Cir. 2001) (visual body cavity search of prison employee performed in a "sensitive and professional manner"); Roberts v. State of Rhode Island, 239 F.3d 107, 113 (1st Cir. 2001) (private, visual inspection of arrestee by same-sex officer found reasonable); Amaechi v. West, 237 F.3d 356, 359-62 (4th Cir. 2001) (public inspection, in front of plaintiff's house and observed by her five children and by her neighbors, by opposite-sex officer involving slight genital penetration with ungloved hand found unreasonable); Skurstenis v. Jones, 236 F.3d 678, 683-84 (11th Cir. 2000) (inspection in a private place of arrestee for body lice by an opposite-sex medical professional found reasonable); Thompson v. Souza, 111 F.3d 694, 700 (9th Cir. 1997) (contrasting the reasonable visual body cavity search of an inmate with unreasonable contact

_____

[14] Some courts analyze strip searches or body cavity searches of incarcerated inmates under the Eighth Amendment rather than the Fourth. The cases cited apply the Bell analysis, whether that analysis is doctrinally grounded in the Fourth or Eighth Amendment. See, e.g., Del Raine v. Williford, 32 F.3d 1024, 1039-1042 (7th Cir. 1994) (applying the Bell framework in the Eighth Amendment context).

searches of female inmates performed by non-medical personnel in un-hygienic conditions and in the presence of male police officers); <u>Del Raine v. Williford</u>, 32 F.3d 1024, 1041 (7th Cir. 1994) (contrasting the reasonable digital rectal exam of a prisoner by medical personnel in that case with other searches involving a lack of hygiene or trained medical personnel); <u>Justice</u>, 961 F.2d at 193 (non-contact strip search of an arrestee by two same-sex officers in a private room found reasonable). The manner in which searches are conducted may be justified in some circumstances by emergency conditions. <u>See</u>, <u>e.g</u>, <u>Elliot v. Lynn</u>, 38 F.3d 188, 191-92 (5th Cir. 1994) (emergency prison conditions justified conducting visual body cavity searches of inmates under semi-private conditions); <u>Cookish v. Powell</u>, 945 F.2d 441, 447 (1st Cir. 1991) (<u>per</u> <u>curiam</u>) (semi-private conditions of visual body cavity searches of inmates and presence of opposite-sex officers can be justified by emergency prison conditions).

Considering these factors, we are persuaded that the appellees have testified in deposition to details with regard to the strip searches that, if believed by a jury, could demonstrate that the searches were performed in an unreasonable and unconstitutional manner. Although Stephens testified to a much different search, we relate the facts according to the appellees' account, as we must in this summary judgment posture. Evans and Jordan were not searched in a private place, but were

16

searched in the same room and at the same time. They were shoved against the wall without apparent provocation. When the men did not comply with Stephens's orders to his liking, they were subjected to choke holds. A slender metal object was pushed between their buttocks, contacting each man's anus. This contact search was not performed by medical personnel, and the same slender object was used to touch each man's anus and genitals without any apparent sanitary safeguards. A jury could find that the searches were not performed with sensitivity and professionalism, but rather were performed in a degrading, humiliating and terrifying fashion, punctuated by taunting, threats, rough contact and abusive language unjustified by the surrounding circumstances or the conduct of the appellees and unnecessarily exacerbating the degrading and terrifying nature of the searches.

Having determined the existence of triable issues of fact with regard to the constitutionality of the manner in which the searches were conducted, we must now determine if triable issues of fact remain with regard to Stephens's qualified immunity defense. The defense of qualified immunity will entitle Stephens to summary judgment unless the law was clearly established, either by materially similar precedent, Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002); Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002), or by general legal principles that

17

apply with obvious clarity to the facts of this case, Hope, 526 U.S. at 741, 122 S.Ct. at 2516; Marsh v. Butler County, 268 F.3d 1014, 1032 n.9 (11th Cir. 2001) (en banc), that the manner in which the searches were alleged to have been conducted violated the appellees' constitutional rights.

We readily conclude that there are no materially similar precedents that provided Stephens fair warning of the unconstitutionality of his conduct. The only two cases considering the manner in which a strip search was performed decided at the time of the searches at issue and which could have provided fair warning to Stephens are Bell and Justice.[15] While the Bell Court cautioned that "on occasion a security guard may conduct the search in an abusive fashion," 441 U.S. at 560, 99 S.Ct. at 1885 (citation omitted), the Court provided no factual context to give definition to what constitutes an abusive search. Justice held that a strip search conducted in a minimally intrusive manner was reasonable, but did not indicate what might constitute an unreasonable search.

The appellees argue that the force used during the search was clearly unconstitutional, relying on cases denying police officers qualified immunity for claims of excessive force used to effectuate an arrest. See Vinyard v. Wilson, 311

---

[15] Only decisions of the Supreme Court, the Eleventh Circuit, and the highest court of the relevant state clearly establish the law for purposes of qualified immunity. Marsh, 268 F.3d at 1032 n.10.

F.3d 1340 (11th Cir. 2002); <u>Lee v. Ferraro</u>, 284 F.3d 1188 (11th Cir. 2002); <u>Slicker v. Jackson</u>, 215 F.3d 1225 (11th Cir. 2000); <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919 (11th Cir. 2000); <u>Smith v. Mattox</u>, 127 F.3d 1416 (11th Cir. 1997). The appellees argue that these cases are materially similar to the facts of this case. In each of the cited cases, unnecessary force was used against a suspect or arrestee after the person was obviously subdued or secured and when no reasonable officer could believe the he or she posed a threat to anyone's safety or presented a risk of flight. These cases involve marked factual dissimilarities from the case at issue.

These marked differences are highlighted by the analysis applied in these excessive force cases. The excessive force analysis considers (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest. <u>Lee</u>, 284 F.3d at 1197-98 (citing <u>Graham v. Connor</u>, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872 (1989)). This analysis, tailored to the arrest context, does not provide sufficient guidance to the reasonableness of the manner in which a strip search is conducted. The severity of the arrestee's suspected crime, for example, may be relevant to the justification for the search, but is probably irrelevant to the reasonableness of the manner in which the search is conducted. The significant factual and doctrinal differences between the cases

19

relied upon by the appellees and the facts of this case demonstrate that the cited cases are not materially similar for purposes of the qualified immunity analysis.[16]

The appellees argue that the conduct alleged was so egregious that it obviously violated <u>Bell</u>'s general warning against abusive searches even though this statement in <u>Bell</u> was not tied to any factual context.  See <u>Hope</u>, 536 U.S. at 741, 122 S.Ct. at 2516 ("a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful") (quotation, citation and alteration omitted); cf. <u>Willingham v. Loughnan</u>, 321 F.3d 1299, 1303 ("an official's conduct could run so far afoul of constitutional protections that fair warning was present even when particularized caselaw was absent") (citing <u>Priester</u>, 208 F.3d at 926).

We hold that the general legal principles stated in <u>Bell</u> and <u>Justice</u> do not apply with such obvious clarity to the facts of this case that no reasonable officer

_____

[16]    Even if we were to accept the appellees' analogy to the excessive force cases, we think the closest of those cases is <u>Post v. City of Fort Lauderdale</u>, 7 F.3d 1552 (11th Cir. 1993). There we held that a reasonable officer could have interpreted the plaintiff's action of raising his hands to be cuffed as a hostile act to which spinning the plaintiff around, pushing him against a display case, and applying a choke hold before cuffing him was an appropriate response.  7 F.3d at 1559.  The allegations of force by the appellees in this case demonstrate that force was applied after Jordan took his hands off the wall and turned around to face Stephens and the other officer; by analogy to <u>Post</u>, a reasonable officer could have interpreted these actions as active resistance to the search, to which pushing the appellees back against the wall and applying a choke hold was an arguably justifiable response.

could have believed that the manner in which the strip searches of the appellees were performed was constitutional. Those cases state the proposition that a search must be conducted reasonably, Bell, 441 U.S. at 559, 99 S.Ct. at 1884; Justice at 191, and not abusively, Bell, 441 U.S. at 560, 99 S.Ct. at 1885. The principle of reasonableness, as the Court has noted, "is not capable of precise definition or mechanical application." Id. at 559, 99 S.Ct. at 1884. This principle does not apply with obvious clarity here, where a reasonable officer could have concluded that the manner in which the searches were conducted did not violate the Constitution.

Even under the appellees' version of the facts, an objectively reasonable officer could have concluded that the conduct alleged here with respect to two resistant subjects did not violate the subjects' constitutional rights. Jordan testified that when Stephens ordered him to remove his clothes, he removed his hands from the wall, turned around to face Stephens, and protested. A reasonable officer in these circumstances could have interpreted this as resistance to the search, and could have reasonably believed that the application of some force, including a choke hold, to facilitate the search would not violate the Constitution. Cf. Post, 7 F.3d at 1559.

The law was not clearly established at the time of these searches that

Stephens's use of the slender object would be unconstitutional. We have never held that contact searches are per se unreasonable, and in fact upheld a contact strip search two years after these searches occurred. Skurstenis, 236 F.3d at 681, 683 (strip search of arrestee by medical personnel who ran his fingers through the arrestee's pubic hair to check for body lice was conducted reasonably). Other decisions issued before these searches occurred had approved searches involving not only contact, but also rectal penetration, as reasonable. See, e.g., Del Raine, 32 F.3d at 1041 (digital rectal exam of an inmate by medical personnel); Daughtery v. Harris, 476 F.2d 292, 295 (10th Cir. 1973) (rectal searches of inmates by medical personnel). In light of these decisions, we cannot conclude that Stephens had fair warning that the alleged contact during the searches would be unconstitutional.

Stephens also lacked fair warning that his verbal abuse could violate the Constitution. Several courts have noted that verbal abuse does not usually rise to a level of a constitutional violation. This court, for example, has held that verbal taunts by other inmates do not pose a serious risk to the prisoner's health or safety under the Eighth and Fourteenth Amendments. Edwards v. Gilbert, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989). Cf. McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983) (threatening language and gestures of a corrections officer do not generally violate an inmate's Eighth Amendment rights). Other courts have held that verbal

22

threats and harassment by a government official do not generally violate substantive due process.  King v. Olmsted County, 117 F.3d 1065, 1067 (8th Cir. 1997); Robertson v. Plano City, 70 F.3d 21, 24 (5th Cir. 1995); Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991).  Some courts have applied this principle to the arrest context.  See Hopson v. Fredericksen, 961 F.2d 1374, 1378-79 (8th Cir. 1992) (officer's statement during an arrest that he would knock the arrestee's teeth out and his use of a racial slur did not violate the Fourth Amendment); Keyes v. City of Albany, 594 F.Supp. 1147, 1155 (N.D.N.Y. 1984) ("verbal abuse, including vile language and racial epithets" directed at bystanders during an arrest did not violate their constitutional rights).  In light of this caselaw treating verbal abuse, even vile language and racial epithets, as insufficient to constitute a constitutional violation, we cannot conclude that it was clearly established that Stephens's taunts and threats of prison rape might so exacerbate the intrusiveness of the strip search as to violate the appellees' constitutional rights.[17]

In holding that a reasonable officer would not be compelled, simply from the general principles stated in Bell and Justice, to conclude that the manner in which these searches were conducted was unconstitutional, we emphasize that the

_____

[17]    While we have discussed the several objectionable aspects of these searches separately, we wish to make clear that we have also considered them cumulatively.

appellees have not asserted that they suffered any physical injury as a result of the searches, and they have not asserted any penetration by the slender object. While the appellees have alleged a search that a jury could conclude was unreasonably humiliating, degrading, and terrifying, cf. Justice, 961 F.2d at 192, the alleged conduct does not go "so far beyond the hazy border" between reasonable and unreasonable conduct that every reasonable officer would have to know that it violated the Constitution. Lee, 284 F.3d at 1199.

In sum, under the circumstances here -- the application of some physical force to keep apparently resistant arrestees against the wall during the search, and anal and genital contact with a slender object, all accompanied by verbal abuse but in the absence of any injury or anal penetration -- the law was not clearly established at the time that the searches would violate appellees' rights under the Fourth Amendment.[18] The doctrine of qualified immunity recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of public authority," Marsh, 268 F.3d at 1031 n.8 (quoting Butz v. Economou, 438 U.S. 478, 506, 98 S.Ct. 2894, 2911

---

[18] We note that appellees have not argued that Stephen's actions were "sadistically and maliciously applied for the very purpose of causing harm" to appellees. Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002). Accordingly, we have no occasion to address issues raised by such an argument.

(1978)).  This freedom of action is especially important in the sensitive area of prison security, see Bell, 441 U.S. at 559-60, 99 S.Ct. at 1884-85.  While we recognize the intrusive nature of the searches the appellees claim to have been subjected to, we are unable to conclude that Stephens had fair warning of the unconstitutionality of such conduct under the circumstances.

## IV.  CONCLUSION

The evidence adduced by the appellees and the reasonable inferences therefrom, if believed by a jury, could support the conclusion that Stephens subjected Evans and Jordan to a strip search and body cavity search without reasonable suspicion that these searches would reveal contraband and that Stephens conducted those searches in an unreasonable manner, in violation of Evans's and Jordan's Fourth Amendment rights.  However, because the law was not clearly established that reasonable suspicion was required to conduct the searches at issue, Stephens is entitled to summary judgment on the basis of qualified immunity for claims based on the initiation of those searches.  Also, because the law was not clearly established at the time that a search could not constitutionally be conducted in the manner alleged, Stephens is entitled to summary judgment on the basis of qualified immunity for those claims based on the manner in which the search was

conducted.

Accordingly, the judgment of the district court holding that the search was unconstitutional, both with respect to the initiation of the searches and with respect to the manner in which the searches were conducted, is affirmed. But the judgment of the district court holding that Stephens is not entitled to qualified immunity, both with respect to the initiation of the searches and with respect to the manner thereof, is reversed. This case is therefore remanded with instructions to enter judgment for Stephens.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

PROPST, District Judge, concurring in part and dissenting in part:

I respectfully dissent as to Part III. B. of the majority opinion. The majority concludes that a jury could find that "the searches were performed in an unreasonable and unconstitutional manner." The majority further concludes, however, that Stephens is entitled to qualified immunity on the plaintiffs' claims in that regard "because the law was not clearly established at the time that a search could not constitutionally be conducted in the manner alleged ...." *Bell v. Wolfish*, 441 U.S. 520, 560 (1979) established the law at least by general statements. The opinion stated: "Such an abuse [conducting a search in an abusive fashion] cannot be condoned. The searches must be conducted in a reasonable manner." I submit that any reasonable and competent officer would know that the conduct as alleged here was mentally and physically abusive and unreasonable. While the decision to search may be subject to the defense of qualified immunity, it was part of a continuum of circumstances that further demonstrates the egregiously abusive and unreasonable manner of the search itself. The conduct, as alleged, was manifestly overreaching.

The following quotes from *Hope v. Pelzer*, 536 U.S. 730 (2002) are pertinent:

In assessing whether the Eighth Amendment violation here met the

*Harlow* test, the Court of Appeals required that the facts of previous cases be "'materially similar' to Hope's situation." 240 F.3d, at 981. This rigid gloss on the qualified immunity standard, though supported by Circuit precedent, is not consistent with our cases.

*Id.* at 739 (footnote omitted).

...For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell [v. Forsyth*, 472 U.S. 511,] 535, n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

*Id.*

....

The obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment. Hope was treated in a way antithetical to human dignity-he was hitched to a post for an extended period of time in a position that was painful, and under circumstances that were both degrading and dangerous. This wanton treatment was not done of necessity, but as punishment for prior conduct. Even if there might once have been a question regarding the constitutionality of this practice, the Eleventh Circuit precedent of *Gates* and *Ort*, as well as the DOJ report condemning the practice, put a reasonable officer on notice that the use of the hitching post under the circumstances alleged by Hope was unlawful. The "fair and clear warning," *Lanier*, 520 U.S., at 271, that these cases provided was sufficient to preclude the defense of qualified immunity at the summary judgment stage.

*Id.*at 745-46.

While *Hope* purports to rely, at least in part, on prior controlling Fifth Circuit cases,

it also emphasizes the egregious nature of the alleged conduct.

Regardless of *Hope*, in *Willingham v. Loughnan*, 321 F.3d 1299, 1302 (11th Cir.

2003) this court stated:

> Decisions of this court before the Supreme Court's *Hope* decision demonstrate that the law of the Circuit harmoniously complies with the Supreme Court's reminder. We have repeatedly acknowledged the possibility that a general statement of the law might provide adequate notice of unlawfulness in the right circumstances. For example, before the Supreme Court's decision in *Hope*, this court *en banc* specifically stated that "general statements of law" were capable of giving fair warning of unconstitutional official behavior:
>
> > We acknowledge that preexisting case law, tied to the precise facts, is not in every situation essential to establish clearly the law applying to the circumstances facing a public official so that a reasonable official would be put on fair and clear notice that specific conduct would be unlawful in the faced, specific circumstances. Some general statements of law are capable of giving fair and clear warning in some circumstances: the occasional "obvious clarity" cases per *Lanier*.
>
> *Marsh v. Butler County, Alabama*, 268 F.3d 1014, 1031 n. 9 (11th Cir. 2001) (internal citations omitted); *see also, e.g., Jenkins v. Talladega City Bd of Educ.*, 115 F.3d 821, 825 n. 3 (11th Cir. 1997) (*en banc*) (stating "general principles of [decisional] law *can* provide fair warning" if constitutional rule applies with "obvious clarity" to circumstances facing defendant); *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (recognizing exception to requirement for factually similar cases where conduct so clearly unlawful that preexisting caselaw unnecessary); *Rodriguez v. Farrell*, 280 F.3d 1341, 1350 n. 18 (11th Cir. 2002) ("We very occasionally encounter the exceptional case in which a defendant

officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable (by which we, in the qualified immunity context, always mean every objectively reasonable) officer that what the defendant officer was doing must be 'unreasonable' within the meaning of the Fourth Amendment."); *Skrtich v. Thornton*, 280 F.3d 1295, 1304 n. 9 (11th Circ. 2002) ("[S]ome conduct is so obviously contrary to constitutional norms that even in the absence of caselaw, the defense of qualified immunity does not apply."); *Brent v. Ashley*, 247 F.3 1294, 1303 n. 10 (11th Cir. 2001) (noting general statements of law capable of giving fair warning to officials); *Priester v. City of Riviera Beach, Florida*, 208 F.3d 919, 926 (11th Cir. 2000) (stating conduct which lies at core of Fourth Amendment prohibition makes unlawfulness readily apparent without preexisting caselaw; defense of qualified immunity not allowed); *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) (same). It is not news to us that official conduct may be so egregious that further warning and notice beyond the general statement of law found in the Constitution or the statute or the caselaw is unnecessary; when we first decided this case, we did not believe that precedents with materially similar facts are always needed to overcome the defense of qualified immunity.

I submit, considering the totality of the circumstances and the general statements of law in *Bell*, that the alleged facts depict conduct so egregious as to foreclose the allowance of qualified immunity for the claims addressed in Part III. B.