EDMONDSON, Chief Judge:
This case is about an arresting officer’s investigatory strip search for the purpose of discovering drugs on persons who had been arrested lawfully but had been arrested for offenses that were not drug crimes.
Plaintiffs-Appellees, Peter Evans and Detree Jordan, sued Defendant-Appellant, Police Officer Denis Stephens, alleging that Officer Stephens violated their rights under the Fourth Amendment to the United States Constitution. In ruling on defendants’ motion for summary judgment, the district court concluded Officer Stephens’s acts were unconstitutional and not protected by qualified immunity. A panel of this Court reversed the district court’s decision on qualified immunity. We decided to vacate the panel’s decision and to rehear the appeal. Assuming Plaintiffs’ version of the facts is accurate, we now conclude that the pertinent conduct violated Plaintiffs’ constitutional rights and that qualified immunity applies to just one alleged violation.

BACKGROUND

For this appeal, these alleged and evidenced facts will be supposed to be the true facts.
Plaintiffs are two black males. The events giving rise to this appeal occurred on 22 January 1999; Plaintiffs were then in their early and middle twenties. That night, Evans and Jordan were traveling from Atlanta, Georgia, to Statesboro, Georgia, where both were or had been enrolled at Georgia Southern University. Evans drove himself and Jordan in a rental car. Despite that Evans had made the journey between Atlanta and Statesboro on many earlier occasions, they became lost and traveled down Interstate 85 instead of Interstate 75.
While trying to return to Interstate 75, Evans and Jordan passed through the City of Zebulon, Georgia. There, Officer Stephens, a white male, stopped Evans after Stephens clocked Evans’s car traveling at a speed of seventy-two miles per hour in a forty-five mile per hour zone.[1] A video camera in Stephens’s patrol car recorded the stop. As Stephens approached Evans, another police officer from the City of Concord Police Department arrived on the scene. Stephens suspected Evans might have been driving under the influence, but Evans denied doing so. Stephens then ordered Evans out of the car and searched Evans’s pockets. Stephens claims he found a beer bottle top in one of Evans’s pockets. Evans denies the top was there, and Stephens did not show the bottle top to the recording camera.
Evans stayed at the rear of the rental car when Officer Stephens approached Jordan, who remained seated in the passenger seat. Stephens took Jordan’s drivers license and asked him to exit the car as well. With Evans’s permission, Stephens *1276 searched the car for about five minutes. Stephens claims he saw an open container of an alcoholic beverage in the car. Evans denies it, and Stephens did not follow his usual practice of showing the container to the recording camera.[2]
Officer Stephens cited Evans for speeding and read him the Georgia Implied Consent Law, O.C.G.A. § 40-6-392(a)(4). After Stephens asked whether Evans would consent to a breathalyzer, Evans said he wanted to call his lawyer. Stephens then placed him under arrest and repeated the request. Evans again said that he wanted to talk to his attorney. Stephens charged Evans with D.U.I. refusal and speeding and then placed him in the patrol car. At Stephens’s deposition, he said that Evans had alcohol on his breath, bloodshot eyes, and an unstable demeanor. Officer Stephens concluded the facts authorized the arrest of Evans.
At the scene of the stop, Officer Stephens, by radio, requested a search on Jordan’s name to check for outstanding warrants. The dispatcher relayed to Stephens that a “Detre Jordan” with Plaintiff-Appellant Jordan’s date of birth had an outstanding arrest warrant. Stephens then arrested Jordan.[3] After placing Jordan under arrest, Stephens searched Jordan’s pockets; and Stephens said that he would release Jordan if the warrant was for someone else. While waiting on the tow truck, Stephens and another officer searched the car and surrounding area for approximately seven minutes. This search of the car was the second one that revealed, according to Plaintiffs, nothing.
Officer Stephens then drove Plaintiffs to the Pike County jail. Plaintiffs say that on the way to the jail, Jordan continued to explain the warrant was not for him and to request a phone call. Both men also recall Stephens saying that he is the judge and jury in Zebulon and that he decides who can make phone calls. Evans also recalls Stephens saying that he would “send you niggers away for a long time.”
According to Plaintiffs, Officer Stephens patted them down again before they entered the county jail building. Stephens informed the jailer on duty, Officer Andre Dawson, of the charges against Plaintiffs. Dawson recalls reviewing the report on the “Jordan” in the warrant and concluding that it was not the Plaintiff; Dawson encouraged Stephens to release Jordan.
Officer Stephens became angry and walked Jordan to a room that appeared to be a supply closet or mop storage room. There, Stephens pestered Jordan with racist language and ordered Jordan to place his hands on the wall and to remove his shoes and shirt. Jordan complied. Stephens then ordered Jordan to take off his remaining clothes. When asked to lower his underwear, Jordan protested by turning around and saying that Stephens had the wrong person. Jordan says that Stephens then put him in a choke hold and held him against the ■ wall until Jordan began to gag.[4] Jordan faced the wall again; and then Evans was thrown into the room, hitting Jordan and causing both men to fall. As Jordan tried to stand, Stephens hit Jordan’s side with a baton- *1277 like “cold black” object.[5]
Evans says that, once he was in the room and standing against the wall, Stephens again ordered Jordan to take off his underwear. According to Jordan, after Officer Stephens — in Evans’s presence-pulled Jordan’s underwear to his ankles, Stephens used the same “cold black” object to separate Jordan’s butt cheeks and “stuck me in my anus.”
After searching Jordan, Stephens turned to Evans. Evans says Stephens told him to remove his underwear and then — in Jordan’s presence — placed “the [same] stick in my ass.” According to Evans, Stephens also used the baton to lift Evans’s and Jordan’s testicles. Evans testified at his deposition that Stephens used the same baton on both Plaintiffs and that Stephens did not clean or wipe down the baton during the strip search.
While conducting the strip search, Stephens taunted both Plaintiffs with laughter, racist language and threats of prison — where Stephens promised to send Plaintiffs. After the strip search, Evans and Jordan were made to dress quickly. Plaintiffs were then handcuffed to the bench in front of the jailer; they then spent the night in the general jail population.[6]
Officer Stephens said he had a reasonable suspicion that Plaintiffs had drugs based on their demeanor (nervousness at the roadside stop) and their story of being lost. This suspicion, Stephens claims, justified the strip search for drugs.
Plaintiffs brought suit in the United States District Court for the Northern District of Georgia, claiming in part, that Stephens violated their rights to the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, as well as Title VII of the 1965 Civil Rights Act. In the light of Defendants’ motions for summary judgment, the claims were narrowed to ones based on the Fourth Amendment. The district court decided, if Plaintiffs’ story was true, that the strip search violated Evan’s and Jordan’s constitutional rights and that Stephens was entitled to no immunity. A panel of this Court agreed that the Constitution was violated, because (1) Stephens lacked reasonable suspicion to perform the strip search; and (2) the manner in which he conducted the strip search was unreasonable. Evans v. City of Zebulon, 351 F.3d 485, 497 (11th Cir.2003), vacated by Evans v. City of Zebulon, 364 F.3d 1298 (11th Cir.2004). The panel also concluded that qualified immunity applied to Officer Stephens for both violations. Id.

STANDARD OF REVIEW

We review denials of summary judgment de novo. Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir.2004). We do not make credibility determinations, but instead believe the “evidence of the non-movant ... and all justifiable inferences are to be drawn in his favor.” Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir.2000) (citations omitted).
*1278 As we said in Draper v. Reynolds, 369 F.3d 1270, 1272 (11th Cir.2004), and Rowe v. Ft Lauderdale, 279 F.3d 1271, 1279 n. 9 (11th Cir.2002), we accept the nonmovant’s version of the events when reviewing a decision on summary judgment. When the nonmovant has testified to events, we do not (as urged by Plaintiffs’ counsel) pick and choose bits from other witnesses’ essentially incompatible accounts (in effect, declining to credit some of the nonmovant’s own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.[7] Instead, when conflicts arise between the facts evidenced by the parties, we credit the non-moving party’s version. Our duty to read the record in the nonmovant’s favor stops short of not crediting the nonmovant’s testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

DISCUSSION

We mainly must decide two issues. Whether the strip searches performed on Plaintiffs violated their rights under the United States Constitution and, if so, whether that right — given the circumstances facing Officer Stephens — was already so clearly established that every objectively reasonable officer would have known that Defendant was violating federal law at the time. We conclude that the strip search here violated two rights of Plaintiffs, both arising under the Fourth Amendment. First, the strip searches — as a post-arrest criminal investigation — were unreasonable, because they were not supported by a reasonable suspicion of the existence of drug evidence. Second, even if some strip search might have been lawful, the manner in which these strip searches were performed was also unreasonable as a matter of federal law. In addition, we conclude that the right to be free altogether of a strip search was, under the circumstances, not already clearly established at the time of the incident, but that the Fourth Amendment itself provided, at the time, sufficient notice that the manner of these particular searches was “unreasonable” in the constitutional sense.
1. The Constitutional Violations.
The panel opinion in this case included these words: “Arrestees who are to be detained in the general jail population can constitutionally be subjected to a strip search only if the search is supported by reasonable suspicion that such a search will reveal weapons or contraband.” Evans v. City of Zebulon, 351 F.3d 485, 490 (11th Cir.2003) vacated by Evans v. City of Zebulon, 364 F.3d 1298 (11th Cir.2004). And these words doubtlessly contributed to causing some judges to vote for en banc rehearing.
Most of us are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching — for security and safety purposes — arrestees bound for the general jail population. For background, see Cuesta v. Sch. Bd. of Miami-Dade County, 285 F.3d 962, 969 n. 6 (11th Cir.2002) (strip search policy at jail); Wilson v. Jones, 251 F.3d 1340, 1343 (11th Cir.2001) (same); Skurstenis v. Jones, 236 F.3d 678, 682 *1279 (11th Cir.2000) (same) (solitary confinement). Never has the Supreme Court imposed such a requirement. See Bell v. Wolfish, 441 U.S. 520, 559-60, 99 S.Ct. 1861, 1884-85, 60 L.Ed.2d 447 (1979) (rejecting claim that strip search policy at a federal jail for mostly pretrial detainees violated the Fourth Amendment per se); United States v. Edwards, 415 U.S. 800, 808 n. 9, 94 S.Ct. 1284, 1239 n. 9, 39 L.Ed.2d 771 (1974) (reserving whether “custodial searches incident to incarceration” might violate the Constitution in either “number or ... manner of perpetration”).
But, on reflection, this case provides no opportunity to decide the question of when jailers — for security and safety purposes— may lawfully conduct strip searches of persons about to become inmates in the general jail population. This case raises no questions about the necessities of jail administration. Cf. Bell, 441 U.S. at 559-61, 99 S.Ct. at 1884-86. This case, involves a different kind of search altogether: a post-arrest investigatory strip search by the police looking for evidence (and not weapons). Officer Stephens — who was not a jailer — testified (without contradiction from others) that he strip-searched Plaintiffs because he (as the arresting officer) believed them to be in possession of illegal drugs: the search was part of a criminal investigation looking for evidence.
Never has the Supreme Court explicitly addressed the standard applied to determine if a post-arrest investigatory strip search (away from the complicated context of the nation’s borders) violates the Fourth Amendment. Several cases provide guidance, including Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); Bell, 441 U.S. at 520, 99 S.Ct. at 1861; Edwards, 415 U.S. at 800, 94 S.Ct. at 1234; United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973).
Bell, 441 U.S. at 560, 99 S.Ct. at 1885, 60 L.Ed.2d 447, does involve’ strip searches. Bell concluded that such searches, of inmates in a jail for security purposes, were permissible without probable cause; but it does not address what standard is necessary . for investigative searches outside Bell’s jail security context.
When we balance the need for investigative strip searches for evidence that might be hidden on the arrestee’s body against the intrusiveness inherent in a strip search, we believe Buie, 494 U.S. at 325, 110 S.Ct. at 1093, provides the analytical framework that, at a minimum, would apply to strip searches for evidence. There, the Court addressed a post-arrest protective sweep search of the arrestee’s house. The Court relied, in part, on Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (addressing pat down searches of persons). Id., 494 U.S. at 331, 110 S.Ct. at 1097. Buie concluded that searches of property incident to arrest must be justified by “articulable facts which, taken together with the rational inferences from those facts; would warrant a reasonably prudent officer in believing” the search was necessary. 494 U.S. at 334, 110 S.Ct. at 1098. Put differently, we are confident that an officer must have at least a reasonable suspicion that the strip search is necessary for evidentiary reasons.[8] Perhaps the actual standard is *1280 higher than reasonable suspicion, especially where, as here, the search includes touching genitalia and penetrating anuses. But because Officer Stephens — in the light of the supposed facts — did not meet even the minimum possible standard of reasonable suspicion, we need not decide if the actual standard is something even higher to decide whether Officer Stephens failed to comply with the Constitution.[9]
Whether an officer has a reasonable suspicion is an objective question viewed from the standpoint of a reasonable police officer at the scene. Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 1661-62, 134 L.Ed.2d 911 (1996). It is based on the totality of the circumstances, Garrett v. Athens-Clarke County, 378 F.3d 1274, 1279 (11th Cir.2004), and is a question of law to be reviewed de novo. Ornelas, 517 U.S. at 696-97, 116 S.Ct. at 1662.
Officer Stephens contends that Plaintiffs’ nervousness, their story about being lost, and their traveling in a rental car established reasonable suspicion of drugs capable of justifying the search. After the events underlying this case had occurred, we rejected an analogous argument in United States v. Boyce, 351 F.3d 1102, 1109 (11th Cir.2003), when the government attempted to use similar facts to provide law enforcement officers with a reasonable suspicion for a prolonged traffic stop to search for drugs. In the case now before us, Plaintiffs were arrested not for drugs, but for DUI refusal and an outstanding arrest warrant (for an unspecified offense). Nevertheless, even if the adjuncts of this stop and arrest might have initially supported a reasonable suspicion of drugs, the strength of that suspicion was undermined by other events before the strip search got started.
Officer Stephens searched Plaintiffs’ car for over ten minutes, and taking the facts most favorable to Plaintiffs, he found nothing about drugs. In addition, Stephens searched the area surrounding the car and found nothing about drugs. Furthermore, Plaintiffs testified that Stephens had checked their pockets and twice patted down each of them before he strip-searched them in the jail. These searches also revealed nothing. This lack of revealed evidence undermines the reasonableness of Officer Stephens’s belief that Plaintiffs possessed drugs. See Brent v. Ashley, 247 F.3d 1294, 1302 (11th Cir.2001) (addressing strip search by customs agents). Moreover, Stephens did not observe Plaintiffs attempting to hide anything on their person. See Kraushaar v. Flanigan, 45 F.3d 1040, 1046 (7th Cir.1995) (addressing strip search at jail). Thus, we decide, bearing all the circumstances in mind, that Officer Stephens violated Plaintiffs’ right to be free from an unreasonable search when he performed an investigatory strip search for drugs: he was without the necessary reasonable suspicion that Plaintiffs (arrested on other charges) had drugs — the asserted ground for the searches — on their person.[10]
*1281 We also conclude the manner in which Officer Stephens conducted the strip search violated Plaintiffs’ constitutional rights. Though not directly applicable to this case, Bell acknowledged that even correctional officers in a jail cannot properly conduct strip searches of incarcerated inmates in “an abusive fashion.” 441 U.S. at 560, 99 S.Ct. at 1885 (internal citations omitted). Abuse cannot be condoned. While searches need not be delicately conducted in the least intrusive manner, they must be conducted in á reasonable manner.
Viewing the facts in their totality and taking the facts most favorable to Plaintiffs’ version, we conclude that Stephens conducted these strip searches in an unconstitutional manner. Plaintiffs were taken to and searched in an abnormal place (thus, capable of exciting more fear): a broom closet or supply room, not a dedicated search cell, medical examination room, or even a bathroom. See Justice v. Peachtree City, 961 F.2d 188, 193 (11th Cir.1992) (approving of private room); Skurstenis v. Jones, 236 F.3d at 678, 682 (11th Cir.2000) (bathroom). Little respect for privacy was observed. Each Plaintiff was forced to disrobe, ridiculed, and penetrated by an object in front of the other. See Justice, 961 F.2d at 193 (noting that arrestee and officers were the only people in room).
The physical aspects of the searches are also disturbing. Unnecessary force was used. Evans was thrown into Jordan, causing both men to collapse. As Jordan tried to stand back up, Officer Stephens hit him with a baton-like object. It matters that a body cavity search was undertaken. In addition, while conducting the search, Stephens inserted the same baton or club — without intervening sanitation— in each Plaintiffs’ anus and used the same baton or club to lift each man’s testicles.[11] Apart from other issues, this last practice is highly unsanitary. See Bonitz v. Fair, 804 F.2d 164, 173 (1st Cir.1986) (acknowledging non-hygienic manner of search) overruled on other grounds by Unwin v. Campbell, 863 F.2d 124, 128 (1st Cir.1998), overruled by Johnson v. Jones, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).
In considering the totality of the circumstances, we also consider Officer Stephens’s language. Brown v. City of Hialeah, 30 F.3d 1433, 1436 (11th Cir.1994). See also Bell, 441 U.S. at 560, 99 S.Ct. at 1885 (citing Levi, 439 F.Supp. at 147). From the time Plaintiffs were secured in the patrol car until the end of the search, Stephens used threatening and racist language.[12] We accept that such language *1282 has an impact on people and counts towards the unreasonableness of the manner of the searches.
We do not imply that words alone can make the manner of an otherwise properly conducted search unconstitutional under the Fourth Amendment. But in this case, the totality of the circumstances — for example, the physical force, anal penetration, unsanitariness of the process, terrifying language, and lack of privacy — collectively establish a constitutional violation, especially when the search was being made in the absence of exigent circumstances requiring the kind of immediate action that might make otherwise questionable police conduct, at least arguably, reasonable.
2. Qualified Immunity
Qualified immunity is an affirmative defense available to public officers acting within the scope of their discretionary authority. Harbert Int’l Inc. v. James, 157 F.3d 1271, 1281 (11th Cir.1998).[13] It shields public officers from liability so long as the transgressed right, given the circumstances, was not already clearly established, “that is ‘whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.’ ” Groh v. Ramirez, 540 U.S. 551, 563, 124 S.Ct. 1284, 1293, 157 L.Ed.2d 1068 (2004) (quoting Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)). The applicable law is clearly established if the “ ‘preexisting law dictates, that is, truly compel[s],’ the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs’ federal rights in the circumstances.” Marsh v. Butler County, 268 F.3d 1014, 1031 (11th Cir.2001) (en banc) (citation omitted). In rare circumstances, a “right may be so clear from the text of the Constitution or federal statute that no prior decision is necessary to give clear notice of it to an official.” Rowe v. Ft. Lauderdale, 279 F.3d 1271, 1280 n. 10 (11th Cir.2002) (citation omitted). In such circumstances, the violation is obvious.
A post-arrest investigatory strip search did not obviously violate the Fourth Amendment on its face in 1999. In addition, in 1999, no applicable cases provided a police officer with fair notice that he must have, at least, a reasonable suspicion to conduct a post-arrest investigatory strip search of an adult and with fail* notice that the facts before Officer Stephens were insufficient to make his suspicion reasonable for the search.[14] The law was not settled for what standard applied to post-arrest investigatory strip searches, and Supreme Court precedent was very deferential to post-arrest investigations. See, e.g., United States v. Edwards, 415 U.S. 800, 807-09, 94 S.Ct. 1234, 1239-40, 39 L.Ed.2d 771 (1974); Gustafson v. Florida, 414 U.S. 260, 265-66, 94 S.Ct. 488, 491-92, 38 L.Ed.2d 456 (1973); United States v. *1283 Robinson, 414 U.S. 218, 235-36, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). Justice v. Peachtree City, 961 F.2d 188, 192-93 (11th Cir.1992), could not squarely govern this case: it addressed a strip search of a juvenile arrested for minor offenses (loitering and truancy), and it acknowledged that unique concerns arise with strip searching youngsters. See generally, Brosseau v. Haugen, — U.S. -, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). And United States v. Boyce, 351 F.3d 1102, 1109 (11th Cir.2003), was decided four years after the incident in question. So, Officer Stephens is protected by qualified immunity insofar as the claim is one for conducting a strip search at all.
Qualified immunity, however, does not shield Stephens from Plaintiffs’ separate claim that the manner of the strip search violated their rights under ' the Fourth Amendment: No preexisting case law established this violation or made it obviously clear. Justice and Bell were the only applicable cases to address strip searches, and they could not squarely govern this case. - Both were materially different from this case, and both upheld strip searches.
But the text of the Fourth Amendment prohibits “unreasonable” searches. Seldom does a general standard such as “to act reasonably” put officers on notice that certain conduct will violate federal law given the precise circumstances before them: Fourth Amendment law is intensely fact specific. But we conclude the supposed facts of this case take the manner of, the searches well beyond the “hazy border” that sometimes separates lawful conduct from unlawful conduct. See generally, Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir.2000). The violation was obvious.
Every objectively reasonable officer would have known that, when conducting a strip search, it is unreasonable to do so in the manner demonstrated by the sum of the facts alleged by Plaintiffs. The totality of the facts alleged here made this violation — on the day of the search — clear from the terms of the Constitution itself: No objectively reasonable policeman could have believed that the degrading and forceful manner of this strip search (especially in the light of the complete lack of circumstances that might have called for immediate action to conduct a search without the time for cool and calm thought about how to proceed) was “reasonable” in the constitutional sense. Accordingly, the decision of the district court is affirmed in part, reversed in part, and remanded.
AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

. Evans later plead guilty to reckless driving and does not challenge that plea on appeal.

. By this time, Stephens was joined by an officer from the Pike County Sheriff's Office.

. Stephens did not know what offense had led to the outstanding arrest warrant. The parties agree that the Detre Jordan in the warrant was not Plaintiff-Appellee Jordan.

.According to Evans, the chokehold occurred after Evans was in the room and after Jordan described the order to take off his underwear as "some bullshit and I ain’t going to pull my drawers.”

. Plaintiffs describe the baton-like object as a cold, black cylindrical, object. We use the term "baton-like object” or "baton” to describe whatever Officer Stephens allegedly used to hit and probe Plaintiffs.

. Officer Stephens tells a completely different story: he did not perform a pat down search outside the jail; he did not place Evans and Jordan in a supply closet, but a trustee cell. He recalls asking Evans and Jordan to take off their clothing, but not touching or taunting them. Officer Stephens also says that neither Plaintiff resisted the strip search.

. Plaintiffs' counsel urge us to accept a mixed description of events. Plaintiffs specifically argue that we should credit Officer Stephens’s statement that Jordan in no way resisted or protested the strip search, but that we should also believe Plaintiffs' depiction of the manner of the search, including the choke hold. For summary judgment, we believe the evidence of the nonmovant (at least when, as here, the nonmovant's testimony is not doubtlessly incredible and the movant seems competent to give testimony).

. We stress that we are not deciding that this standard applies to strip searches for other purposes, such as, searches conducted by jailers on arrestees bound for a jail's general population as part of a safety or security routine of the jail. In this case, we are also not dealing with a search for weapons that might pose a threat to the safety of law officers or others.

. By the way, we note that Officer Stephens testified that he believed the legal standard needed for the search was that of reasonable suspicion. Of course, Officer Stephens’s'subjective intentions and beliefs in conducting the strip search are immaterial to the Fourth Amendment analysis. See Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Ulterior motives will not make an otherwise lawful search unlawful.

. Officer Stephens acknowledged that he did not suspect Plaintiffs had weapons in their possession. This view was the objectively reasonable one. At his deposition, Stephens agreed that whatever reasonable suspicion he had, it was for drugs and "never for weapons.”

. Today, we do not say that body cavity searches that penetrate orifices are per se unconstitutional. See, e.g., Isby v. Duckworth, 175 F.3d 1020, No. 97-3705, 1999 WL 236880, *2 (7th Cir. Mar. 11, 1999) (unpublished).

. In the patrol car, Officer Stephens said that he was "judge and jury” in Zebulon and that he would decide whether Plaintiffs could make a phone call from the jail. He also told Plaintiffs that he would "send you niggers away for a long time.” Once in the room where the strip search occurred, Stephens called Evans a smart aleck and a smart ass. He told Jordan that he didn’t like "you boys in my town. I don’t want niggers here anyway.” Stephens told another officer allegedly in the room that Evans and Jordan made "my jail cell smell[] like [Plaintiffs],” and that he would send Plaintiffs to prison for the rest of their lives. While he penetrated Plaintiffs' anuses with the baton, he said that Plaintiffs had "better get used to this, this is how it is in the big house, this is where you [sic] getting ready to go. Somebody is going to be butt fucking you for the next twenty years, all because you got a smart mouth.”
We understand that law officers sometimes use harsh words as a kind of verbal "shock and awe” tactic to deter arrestees from causing trouble that might cause violent injuiy to *1282 the officer or someone else. We do not say this kind of practice is inherently unlawful or commonly will help to cause accompanying searches or seizures to be unlawful. In this case, Plaintiffs contend they were under police control and in custody and posed no threat to Officer Stephens who, at the time of the search, was at a jail and in the company of another officer.

. Plaintiffs argue that Stephens acted outside his authority when he strip searched Plaintiffs, because the police chief verbally prohibited Stephens from performing strip searches. We disagree. Chief Lummis’s instruction was limited to roadside strip searches and did not address other strip searches.

. When case law is needed, only cases from the Supreme Court, our Circuit or the highest court of the pertinent state clearly establish the law in the Circuit for qualified immunity analysis. Marsh, 268 F.3d at 1033 n. 10.