[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**JUNE 19, 2003**
**THOMAS  K. KAHN**
**CLERK**

_____

No. 01-15990

_____

D.C. Docket No. 00-01773-CV-KMM

DONATO DALRYMPLE,
GREGORY PAUL ALLEN, et. al.,

Plaintiffs-Appellees,

versus

JANET RENO, in her personal capacity,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 19, 2003)**

Before TJOFLAT, COX and BRIGHT*, Circuit Judges.

_____
*Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by
designation.

TJOFLAT, Circuit Judge:

Like our decision in Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003), this case arises from the events surrounding the seizure by federal agents of Elian Gonzalez ("Elian") from the home of Lazaro, Angela, and Marisleysis Gonzalez ("the Gonzalezes") on April 22, 2000. In Gonzalez v. Reno, we held that former Attorney General Janet Reno, former Commissioner of the Immigration and Naturalization Service ("INS") Doris Meissner, and former Deputy Attorney General Eric Holder were entitled to qualified immunity from damages claims by the Gonzalezes because the Gonzalezes failed to establish a causal connection between the supervisory actions of Reno, Meissner, and Holder and the alleged excessive force by the federal agents who forcibly removed Elian Gonzalez from the Gonzalezes' home on April 22, 2000. Now, we must decide whether former Attorney General Reno is entitled to qualified immunity from damages claims by Donato Dalrymple, who was in the Gonzalezes' house when Elian was taken, and fifty-one protestors, neighbors, and passers-by who claim they were sprayed with gas, shoved, kicked, and threatened at gunpoint by federal agents during the raid to seize Elian from the Gonzalezes' home. We conclude that, like the Gonzalezes, these plaintiffs have failed to establish a causal connection between Reno's

2

supervisory actions and the allegedly unconstitutional acts of the federal agents on the scene.

## I.

On November 25, 1999, six-year-old Elian Gonzalez, a Cuban boy, was found floating on an innertube off the coast of Fort Lauderdale, Florida. The INS paroled Elian into the United States without inspection and released him into the custody of his great-uncle, Lazaro Gonzalez. After learning that Elian's father, a Cuban citizen, had requested that his son be returned to Cuba, the INS refused to consider petitions for Elian's asylum and sought to transfer the child's custody from his uncle to his father, who was in the United States at that time. On April 21, 2000, the INS issued an administrative arrest warrant for Elian and obtained a search warrant for the Gonzalezes' residence. At approximately 5:15a.m. on April 22, 2000, armed federal agents arrived at the Gonzalezes' home to execute the search and arrest warrants.[1]

On July 12, 2000, the plaintiffs commenced this action under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), by filing a three-count complaint for damages

---

[1]The events leading up to the pre-dawn raid on April 22, 2000, are explained in more detail in Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).

against Attorney General Reno, INS Commissioner Meissner, and Deputy Attorney General Holder, in their individual capacities. Unlike the Gonzalezes' complaint, this complaint did not bring suit against the federal agents on the scene. The complaint alleged the following facts regarding the events that transpired in the Gonzalezes' neighborhood during the raid to seize Elian on April 22, 2000.

Plaintiff Dalrymple, the man who rescued Elian from the sea, was asleep on a couch in the Gonzalezes' front foyer when the raid began. After being awakened by the sounds of the federal agents, Dalrymple scooped up Elian from a couch in the living room and carried him to the rear bedroom shared by Lazaro and Angela Gonzalez. Associated Press photographer Alan Diaz, Elian's five-year-old cousin Lazaro Martell, and Martell's mother also ran into the room. Dalrymple held Elian in his arms as federal agents kicked down the bedroom door. One federal agent yelled at Dalrymple to give him the boy while pointing a 9mm submachine gun at Dalrymple. INS Agent Betty A. Mills entered the room with a blanket and grabbed Elian. The federal agents then backed out of the room with Elian, their weapons still aimed at the occupants of the room. The agents exited the house and carried Elian to a van waiting outside.

The other plaintiffs are protestors, neighbors, and passers-by who were present in the Gonzalezes' neighborhood at the time of the raid. When the convoy

4

of federal agents arrived, the protestors were gathered behind a barricade to the west of the Gonzalezes' residence, in neighbors' yards, and elsewhere in the neighborhood to demonstrate support for Elian and the Gonzalezes. When the federal agents arrived, they "immediately began indiscriminately spraying gas to immobilize, restrain and suppress persons who had assembled peacefully behind the barricade, as well as neighbors, passers-by, and even members of the news media assembling along N.W. 2nd Street." The federal agents sprayed them with gas repeatedly, threatened to shoot them, held them at gunpoint, struck them with battering rams, clubs, and rifle butts, kicked them, shoved them to the ground, and shouted obscenities at them. Many of the neighbor plaintiffs were exposed to gas in their homes or when they stepped outside to see what was happening. Thirty-three of the plaintiffs were attempting to move closer to the Gonzalezes' residence when they were sprayed directly in the face with gas, held at gunpoint, struck, and shoved to the ground. Many of the protestor plaintiffs remained behind the barricade when their injuries occurred. The most common physical injuries suffered by plaintiffs were eye, nose, throat and skin irritation and burning, coughing, choking and difficulty breathing.

In the complaint, forty-three plaintiffs alleged violations of their freedoms of assembly and expression under the First Amendment, twenty-five alleged

violations of their rights to be free from unreasonable searches and seizures under the Fourth Amendment, and all fifty-two alleged violations of their rights to be free from excessive physical force under the Fifth Amendment. In a joint motion to dismiss dated August 15, 2000, the defendants asserted the defense of qualified immunity. In an order dated October 1, 2001, the district court granted in part and denied in part the defendants' motion. The court dismissed all claims against Meissner and Holder without prejudice because the complaint failed to allege that either Meissner or Holder supervised the attorney general or was acting in a supervisory capacity when the order to seize Elian was given. The court concluded that only Reno was alleged to have exercised supervisory authority in ordering the raid.

With respect to Reno, the district court dismissed the Fourth Amendment claims of five plaintiffs who would be unable to prove they were unlawfully seized because they alleged that they left the scene immediately after being confronted by federal agents. The district court also dismissed all of the plaintiffs' Fifth Amendment claims with prejudice because, under the alleged circumstances, "no reasonable fact finder could conclude that Reno's decision to send 151 armed agent[s] to execute the warrants deprived Plaintiffs' due process in a manner that shocks the conscience." Finally, construing the complaint's allegations broadly,

6

the court rejected Reno's qualified immunity defense with respect to the remaining First and Fourth Amendment claims because "[t]he law was clearly established that governmental restriction of expressive conduct violated the First Amendment if the restriction was motivated by the speaker's message. . . . [and] a reasonable officer in Reno's position would know that the law forbade her from directing the execution of a warrant in a manner that called for unjustified force against bystanders."

Reno now appeals, contending that she is entitled to qualified immunity for her actions. We agree.

## II.

We have jurisdiction to review the denial of the defense of qualified immunity on interlocutory appeal pursuant to 28 U.S.C. § 1291. Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817, 86 L. Ed. 2d 411 (1985). We review de novo a district court's decision to grant or deny the defense of qualified immunity on a motion to dismiss, accepting the factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. Chesser v. Sparks, 248 F.3d 1117, 1121 (11th Cir. 2001).

Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates

7

"clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). Qualified immunity "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.' " Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Willingham v. Loughman, 261 F.3d 1178, 1187 (11th Cir. 2001)). Questions of qualified immunity should be resolved at the earliest possible stage in the litigation. Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991) (per curiam). A district court should therefore grant the defense of qualified immunity on a motion to dismiss if the complaint "fails to allege the violation of a clearly established constitutional right." Chesser, 248 F.3d at 1121 (quoting Williams v. Ala. State Univ., 102 F.3d 1179, 1182 (11th Cir. 1997)).

To receive qualified immunity, the government official must first prove that she was acting within her discretionary authority. Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). In this case, it is clear – and undisputed – that Reno was acting within her discretionary authority when she ordered federal agents to seize Elian Gonzalez.

Once the government official has established that she was acting within her discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate. Id. The Supreme Court has set forth a two part analysis for determining whether qualified immunity is appropriate. Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). The court must first ask the threshold question whether the facts alleged, taken in the light most favorable to the plaintiffs, show that the government official's conduct violated a constitutional right. Id. If the complaint alleges the violation of a constitutional right, the court must determine whether that right was clearly established at the time of the violation. Id.

Our first step, then, is to determine whether the factual allegations in the complaint, if true, establish a constitutional violation by former Attorney General Reno. The district court properly characterized the complaint as alleging that Reno is liable in her supervisory capacity only. Therefore, for purposes of this opinion, we will assume, without deciding, that the alleged conduct by the agents on the scene violated the plaintiffs' First and Fourth Amendment rights. See Hartley v. Parnell, 193 F.3d 1263, 1268-69 (11th Cir. 1999) (in section 1983 sexual abuse case, assuming, without deciding, that male teacher deprived female student of substantive due process rights, then proceeding with the analysis to

9

determine whether school principal caused that deprivation).  This leaves us with the task of deciding whether Reno's supervisory actions caused the alleged constitutional violations by the agents on the scene.

"It is well established in this circuit that supervisory officials are not liable under [Bivens] for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.' " Id. at 1269 (quoting Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994)).  "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous."  Braddy v. Florida Dep't of Labor & Empl. Sec., 133 F.3d 797, 802 (11th Cir.1998).  Supervisory liability "occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation."  Id. at 802 (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)); see also Greason v. Kemp, 891 F.2d 829, 836 (11th Cir. 1990) (explaining that a supervisor "can be held liable under [Bivens] when a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights of the plaintiff, and his conduct was causally related to the constitutional violation committed by his subordinate") (citations and footnote omitted).  A causal connection can be established "when a history of

10

widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," id., or when the supervisor's improper "custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991). A causal connection can also be established by facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. See Post v. City of Fort Lauderdale, 7 F.3d 1552, 1561 (11th Cir. 1993) (finding no supervisory liability in the absence of such an inference).

In examining the factual allegations of the complaint, we must keep in mind the heightened pleading requirements for civil rights cases, especially those involving the defense of qualified immunity. GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1367 (11th Cir. 1998). In such cases, the complaint must allege the relevant facts "with some specificity." Id. "[M]ore than mere conclusory notice pleading is required. . . . [A] complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory." Fullman v. Graddick, 739 F.2d 553, 556-57 (11th Cir. 1984); see also Veney v. Hogan, 70 F.3d 917, 922 (6th Cir. 1995) (holding that complaint must "include the specific, non-conclusory allegations of fact that will enable the district court to determine

11

that those facts, if proved, will overcome the defense of qualified immunity"). Moreover, in reviewing a motion to dismiss, we need only accept "well-pleaded facts" and "reasonable inferences drawn from those facts." Oladeinde v. City of Birmingham, 963 F.2d 1481, 1485 (11th Cir. 1992). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001). We must also keep in mind the fact that "[w]e generally accord . . . official conduct a presumption of legitimacy." United States Dep't of State v. Ray, 502 U.S. 164, 179, 112 S. Ct. 541, 550, 116 L. Ed. 2d 526 (1991).

We now turn to the complaint to determine whether plaintiffs have alleged sufficient facts to establish a causal connection between Reno's supervisory actions and the alleged constitutional violations by the officers on the scene. To support their allegation of a causal connection, plaintiffs allege that "Reno . . . ordered the raid . . . despite knowing and intending that: (1) a strike force of 151 heavily-armed federal agents . . . would be unleashed on the Gonzalez family's home and neighborhood; (2) peacefully assembled supporters would be sprayed with gas for having assembled and expressed their support for Elian and the Gonzalez family, and to prevent them from continuing to do so; and (3) neighbors, supporters and passers-by would be gassed, restrained, beaten, threatened and put

12

in immediate fear for their lives and liberty." Plaintiffs further allege that "the raid was a carefully-choreographed, pre-planned event, the details of which [Reno] had fully approved" and that "Reno admitted that the only independent authority given to the federal agents on the scene was the precise timing of the raid." Complt. ¶ 184. Plaintiffs also rely on statements Reno made after Elian was seized in which she stated that "[a]ll objectives for Operation Reunion were met, with no significant injuries to either federal agents or bystanders and **no fundamental changes to the approved plan**." (emphasis in original).

Plaintiffs' allegations of a causal connection between Reno's supervisory actions and the alleged constitutional violations by the agents on the scene are vague and conclusory and fail to meet the heightened pleading requirements for civil rights cases involving qualified immunity. Plaintiffs allege that Reno knew and intended that the constitutional violations by the line duty officers would occur, but they fail to allege any facts in support of this allegation. Plaintiffs fail to allege that the detailed plan for the raid included spraying peaceful protestors, neighbors, and passers-by with gas, beating them, detaining them at gunpoint, or threatening to shoot them. Plaintiffs point to the fact that Reno sent 151 armed agents into the neighborhood even though she knew protestors had assembled in the neighborhood to support Elian. It is not reasonable to infer from these facts

13

that Reno sent this many agents in order to use excessive physical force against the plaintiffs or to infringe on their First Amendment rights. A reasonable inference drawn from these facts would be that the presence of so many protestors in the neighborhood added to the uncertainty and risk of the mission to seize Elian, thereby necessitating the use of more agents to insure the agents' safety and the mission's success. Indeed, the plaintiffs' own complaint further bears this inference out because the complaint alleges that thirty-three of the plaintiffs who were allegedly unlawfully seized were actually moving closer to the Gonzalezes' home as the raid was being executed, undoubtedly causing the agents to feel uncertainty and perhaps alarm regarding the plaintiffs' possible intentions to interfere with the agents' mission.

Plaintiffs' allegations that the raid was carefully planned, virtually no discretion was given to the agents on the scene, and the mission was executed without deviation from the plan are likewise insufficient to establish supervisory liability. It is not reasonable to draw from these facts the inference that the plan Reno ordered the officers to carry out called for the agents to use excessive force against the plaintiffs or to interfere with the plaintiffs' rights under the First Amendment. It would be reasonable, however, to draw from these facts the inference that Reno ordered the agents to carry out a carefully planned mission to

14

lawfully execute search and arrest warrants by seizing Elian, and that Reno's statements about lack of deviation from the plan refer to the fact that the plan's objective – seizing Elian – was achieved.

Plaintiffs have failed to allege a constitutional violation by Reno because they have failed to allege facts that would establish a causal connection between Reno's supervisory actions and the alleged constitutional violations by the officers on the scene. Reno is therefore entitled to qualified immunity under the first part of the analysis required by Saucier v. Katz, 533 U.S. at 201, 121 S. Ct. at 2156. Because we find no constitutional violation by Reno, we need not address whether the constitutional rights at issue were clearly established. The district court's decision denying the defense of qualified immunity is hereby REVERSED.

SO ORDERED.