Keith L. THOMPSON, Plaintiff,

v.

Lois SPEARS, in her individual capacity as Director, Miami–Dade County Department of Corrections and Rehabilitation, and MIAMI–DADE COUNTY, a political subdivision of the State of Florida, Defendant.

Nos. 03–20077–CIV–GOLD, 03–20077–CIV–SIMONTON.

United States District Court, S.D. Florida.

July 19, 2004.

Cornelius Shiver, Esq., Miami, for Plaintiffs.

Kenneth Drucker, Esq., Miami, for Defendants.

## SUMMARY JUDGMENT ORDER

GOLD, District Judge.

THIS CAUSE is before the Court upon Defendant Miami–Dade County's Motion for Summary Judgment [DE 44], Defendant Lois Spears' Motion for Summary Judgment [DE 41], Plaintiff Keith L. Thompson's Motion for Summary Judgment [DE 49], and Miami–Dade County and Lois Spears' Motion in Limine [DE 58]. Oral argument on these motions was held on July 9, 2004.

Plaintiff's Amended Complaint alleges five counts: (1) civil rights violations by Spears pursuant to 42 U.S.C. § 1983; (2) civil rights violations by the County pursuant to 42 U.S.C. § 1983; (3) negligent supervision by the County; and (4) negligent infliction of emotional distress by the County.[1] After reviewing the parties' arguments, the record, and the relevant case law and statutes, I conclude that Defendants' Motions for Summary Judgment should be GRANTED and Plaintiff's Motion for Summary Judgment should be DENIED.

### Facts[2]

*The Events Giving Rise to Plaintiff's Lawsuit*

On October 27, 1998, Plaintiff Keith Thompson ("Thompson" or "Plaintiff") was arrested in Jacksonville, Florida for aggravated battery against a pregnant female,

1. Plaintiff's Amended Complaint originally asserted a claim for civil rights violations for failure to provide medical treatment pursuant to 42 U.S.C. § 1983. However, this claim was voluntarily dismissed. **[DE 40]**. I have renumbered the counts to reflect the dismissal of this claim, which was originally Count III.

2. The following facts are derived from the parties' Local Rule 7.5 Statements and the exhibits submitted in support thereof. Plaintiff's Local Rule 7.5 statement did not directly refute Defendants' Local Rule 7.5 statements, so very few factual disputes are noted. The facts not refuted by the Plaintiff and alleged by Defendants in their Local Rule 7.5 Statements are deemed as admitted as per Local

violation of an injunction for protection against domestic violence, driving with a suspended license, and resisting and opposing an officer without violence by using a false name. (Miami–Dade 7.5 Stat. at 1–2). On May 5, 1999, he was tried and found guilty of aggravated battery and sentenced to five years imprisonment.[3] (Miami–Dade 7.5 Stat. at 2).

In October 1999, when Plaintiff was serving time at the Gainesville Correctional Institute, a Florida state court ordered Plaintiff's transfer to Miami–Dade County Department of Corrections and Rehabilitation (the "Department") to appear in a family court matter. (Miami–Dade 7.5 Stat. at 2). During his transport from Gainesville, Thompson was told by unidentified inmates that he would be subject to harassment because he was from out of the area. (Miami–Dade 7.5 Stat. at 2). Thompson states that two officers transporting Thompson overheard the prisoners' conversation and told Thompson that since he was from out of Miami–Dade County, he could expect physical violence from inmates in the County. (Thompson 7.5 Stat. at 1).

On October 28, 1999, Plaintiff arrived at the Pretrial Detention Center ("PTDC"). He remained in the blue prison clothes that had been issued to him at the Gainesville Correctional Institute. (Thompson 7.5 Stat. at 3). He was placed in a temporary cell on the second floor of the prison where he was warned by other inmates that since he was from out of town, he could expect harassment from inmates. (Thompson 7.5 Stat. at 3). The next day the Reception and Diagnostic Unit determined that he belonged in a maximum security cell and assigned him to cell 5B1. (Miami–Dade 7.5 Stat. at 2).

Once he arrived at cell 5B1, inmates began to harass him because no other inmate was wearing a blue outfit. (Thompson 7.5 Stat. at 3). The harassment started out as verbal threats but escalated when other inmates would not allow Thompson to use the telephone and would take his food. (Thompson 7.5 Stat. at 3).

Thompson told several unnamed correctional officers that he wanted to be moved into protective custody, but the officers ignored his requests and told him to speak to the sergeant on the next shift. (Miami–Dade 7.5 Stat. at 2). He also told officers on the fifth floor that he wanted to be in protective custody and filled out grievance forms. (Thompson 7.5 Stat. at 4; Miami–Dade 7.5 Stat. at 2). No action was taken on the grievance forms; the officers again rejected his pleas for protection by informing him that the sergeant handled these types of matters. (Thompson 7.5 Stat. at 5).[4]

Rule 7.5(D) ("All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the opposing party's statement, if and only to the extent supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court.").

3. On June 13, 2000, the Florida District Court of Appeal reversed the conviction, ordered a new trial, and vacated and set aside Plaintiff's sentence. On July 26, 2000, the court imposed a new sentence of 564 days, with credit for time served.

4. Thompson's Local Rule 7.5 Statement asserts that Officer Michael Williams, otherwise known as "Duck Down," testified at his deposition that he told Thompson to wait until the next day when Thompson requested to be placed into protective custody. However, Thompson did not submit the pages of Williams' depositions that he alleges contain evidence of this. He cites page 9 of Williams' deposition, but he only submitted deposition testimony beginning on page 16 with his materials in opposition to the County's Summary Judgment Motion. **[DE 53]**. Accordingly, on this factual issue, I consider only those portions of Thompson's Local Rule 7.5 Statement supported by Thompson's deposition testimo-

At approximately 2:00 a.m. on December 4, 1999, after the Miami Dolphins beat the Jacksonville Jaguars in a football game, he was beaten by several inmates. (Miami–Dade 7.5 Stat. at 2). The inmates used razors to cut a sheet and tied Thompson's arms and legs behind his back. (Thompson 7.5 Stat. at 6). Thompson alleges that the inmates punched and kicked him in his shoulder, neck, side, and back and put a sock in his mouth while one inmate held his nose; he states that he passed out as a result. (Thompson 7.5 Stat. at 6). He further alleges that the attack lasted for about two and one half hours, and he could not fight back because there were too many inmates. (Thompson 7.5 Stat. at 5). He testified at his deposition that Officer Williams took him out of his cell and had him fill out a police report and identify the attackers. (Miami–Dade 7.5 Stat. at 2). However, Officer Williams told him that criminal charges could not be brought against the assailants at that time. (Thompson 7.5 Stat. at 7). Though Thompson filled out a police report, jail officials did not complete an incident report about the December 4, 1999 events. (Thompson 7.5 Stat. at 8).

Thompson was taken to the medical clinic for a physical examination. (Miami–Dade 7.5 Stat. at 3). He reported to the nurse that he had been beaten by other inmates. (Miami–Dade 7.5 Stat. at 3). Seeing only minor redness to Thompson's wrists, the nurse wrote him a referral to the psychiatric ward. (Miami–Dade 7.5 Stat. at 3). Thompson was escorted back to the lobby on the fifth floor, where he remained for about a half-hour. (Miami–Dade 7.5 Stat. at 3). He was then transported to the ninth floor for examination by a psychiatrist. (Miami–Dade 7.5 Stat. at 3). The psychiatrist that examined Thompson determined that he was not sui-

cidal and cleared him for return to the fifth floor. (Miami–Dade 7.5 Stat. at 3).

When Thompson returned to the fifth floor, he spoke with Sergeant Linda Gray about the physical violence he had endured since being booked into the PTDC. (Thompson 7.5 Stat. at 9). He asked to be placed into protective custody but was told he did not need it. (Thompson 7.5 Stat. at 9).

Thompson was reassigned to a new cell, 5A3, on a different wing of the fifth floor. (Miami–Dade 7.5 Stat. at 3). He overheard inmates talking about a snitch being on the fifth floor. (Thompson 7.5 Stat. at 9). He stated that inmates can communicate with each other on the fifth floor through trustees, through "flying a kite," and at recreation time, when the entire fifth floor is together. (Thompson 7.5 Stat. at 9).

About an hour after he entered his new cell on the fifth floor, he was knocked unconscious by other inmates. (Miami–Dade 7.5 Stat. at 3). Thereafter, correctional officers responded to banging in the cell and found Thompson injured. (Miami–Dade 7.5 Stat. at 3). Thompson woke up, saw blood everywhere, and blacked out again. (Thompson 7.5 Stat. at 9). He was taken immediately to the PTDC's medical clinic for evaluation and then to Jackson Memorial Hospital, where he received an examination, medication, and x-rays. Plaintiff suffered bruising and a broken jaw. (Miami–Dade 7.5 Stat. at 3).

Thompson did not make a report about the second assault; he had sustained a broken jaw and could not talk. (Thompson 7.5 Stat. at 10). His jaw was broken in two places and he needed surgery to close the fractures. (Thompson 7.5 Stat. at 10). Since the attack on December 4, 1999, Thompson continues to experience

ny and not the facts allegedly contained with-

in Officer Williams' deposition testimony.

chronic pain and physical limitations. (Thompson 7.5 Stat. at 10).

### The Pretrial Detention Center

The PTDC is a ten-story building with three wings in a "Y" shape. (Miami–Dade 7.5 Stat. at 3). A control booth is situated in the middle of the "Y" on each floor and is continuously occupied by a correctional officer who controls access to the bar doors leading to each wing. (Miami–Dade 7.5 Stat. at 3). Inmates are housed out of the sight of the control booth and lobby area, where officers are stationed when not making walks through the cells. (Thompson 7.5 Stat. at 2). The County states that the officer inside the control booth is within hearing distance of all the cells at all times. (Miami–Dade 7.5 Stat. at 3). However, Thompson asserts that inmates are housed out of the normal sound of the booth.[5] (Thompson 7.5 Stat. at 4). If an inmate needs emergency assistance and there is no officer on the walkway, the inmate must bang on the cell door to alert the officers. (Thompson 7.5 Stat. at 2). Thompson noticed during his first week at the PTDC that when correctional officers would leave the cell block floors, inmates would turn the radio and television volume up. (Thompson 7.5 Stat. at 3). The living quarters or cells within the PTDC are not equipped with any surveillance devices, cameras or listening devices. (Thompson 7.5 Stat. at 3).

The fifth floor of the PTDC, where Thompson was housed, is reserved for maximum security inmates. (Miami–Dade 7.5 Stat. at 3). The dormitory cells on this floor each house approximately twenty (20) inmates and contain bunks, showers, toilets, and a communal area with picnic-style tables. (Miami–Dade 7.5 Stat. at 3–4). A walkway surrounds the perimeter of the Y, allowing visual observation within each cell from the walkway. (Miami–Dade 7.5 Stat. at 4). There are four dormitory cells in both the "A" and "B" wings where Thompson was housed. (Miami–Dade 7.5 Stat. at 4).

According to Thompson, inmates on the fifth floor have knives, razors, brass knuckles and illegal drugs in their possession, and there are numerous fights in the PTDC. (Thompson 7.5 Stat. at 2).

### Miami–Dade County Corrections and Rehabilitation Department Policies Regarding Inmate Care, Custody, and Control

Inmates at the PTDC are subject to frequent visual monitoring and checks. First, officers conduct visual checks of the inmates at least once per hour and record the check in a log. (Miami–Dade 7.5 Stat. at 4). Second, a supervisor conducts a security check of each cell twice during each shift and records the time in a log. (Miami–Dade 7.5 Stat. at 4). Third, several officers conduct a head count and/or body count of each inmate during all three shifts. (Miami–Dade 7.5 Stat. at 4). Fourth, inmates are checked when meals are served three times a day. (Miami–Dade 7.5 Stat. at 4). Fifth, nurses make rounds of the cells during the day shift to

---

**5.** In addition to his own testimony on this point, Thompson offers the expert opinion of Thomas Rosazza that inmates are housed outside of the officers' hearing distance. The Defendants have moved to exclude this testimony on the basis that Rosazza has never been to the PTDC and thus his testimony is not based on personal observation. [Defendants' Motion in Limine, DE 58]. Plaintiff filed no opposition to this Motion. Having reviewed the motion, I conclude that it should be GRANTED. Accordingly, Rosazza's opinion that inmates are housed outside of officers' hearing distance is STRICKEN. Pursuant to that motion, Thompson is also precluded from offering testimony at trial related to (1) the fact that Plaintiff's transfer from state prison to the PTDC was by mistake and (2) the actions of the Miami–Dade County Board of County Commissioners almost two years after the incident forming the basis of Plaintiff's Amended Complaint.

distribute medication. (Miami–Dade 7.5 Stat. at 4). Sixth, a counselor makes rounds of the cells each weekday to answer questions, process requests for court services, and handle grievances. (Miami–Dade 7.5 Stat. at 4). Seventh, officers interact with the inmates each day when taking inmates to court, church, the medical clinic, recreation, the law library, interviews, and visitation. (Miami–Dade 7.5 Stat. at 5). Finally, on numerous days, including during the 11:00 p.m. shifts on December 3 and 4, 1999, when Plaintiff was beaten, a correctional officer is assigned to the catwalk around the perimeter of the cells. (Miami–Dade 7.5 Stat. at 6).

Department policy requires an investigation to be conducted when an inmate complains that he is in fear for his life; the inmate is also to be immediately removed from the cell and reassigned. (Miami–Dade 7.5 Stat. at 6). The Department requires officers to investigate and respond to complaints of assaults involving inmates, and to take appropriate action, including separating inmates, imposing discipline, and/or bringing criminal charges against offenders. (Miami–Dade 7.5 Stat. at 6). Additionally, department policy requires officers to complete an incident report following any unusual occurrence, including inmate fights. (Miami–Dade 7.5 Stat. at 6). Immediately following any incident resulting in injury to an inmate, the inmate is to be taken to the medical clinic at the jail for evaluation and treatment. (Miami–Dade 7.5 Stat. at 6). The Department also classifies and segregates inmates based on their propensity for violence, conducts regular shakedowns to find and remove contraband from cells and bunks, trains correctional officers on inmate care, custody, and control, attempts to reduce overcrowding in cells, disciplines inmates and correctional officers for violation of procedures, and reviews policies and procedures yearly to make the PTDC safer for both inmates and employees.

*Lois Spears' Involvement*

Lois Spears was director of the Miami–Dade County Department of Corrections and Rehabilitation from approximately October 1998 through June 2003, including the time of the incidents alleged in the Complaint. (Spears 7.5 Stat. at 1). While Spears was director of the Department, she adopted the measures previously described to improve security, including hourly visual checks and the recording of the checks into a log. (Spears 7.5 Stat. at 2).

Spears never had any direct or indirect contact with Thompson and had no involvement regarding his housing assignments and classification. (Spears 7.5 Stat. at 1). She has no knowledge that Thompson ever complained to any correctional officer that he feared for his safety or requested orally or in writing to be placed into protective custody. (Spears 7.5 Stat. at 1–2). She also has no knowledge regarding Thompson's allegations that other inmates assaulted him nor regarding his alleged injuries. (Spears 7.5 Stat. at 2).

**Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). The moving party has the burden to estab-

lish the absence of a genuine issue as to any material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.,* 121 F.3d at 646.

Once the moving party has established the absence of a genuine issue of material fact, to which the nonmoving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson,* 477 U.S. at 247–51, 106 S.Ct. at 2510–11; *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir.2001).

If the non-moving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the court must enter summary judgment for the moving party. *Id.* (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552). Moreover, when the non-moving party bears the burden of proof on an issue, the moving party need not support its motion with affidavits or other similar material negating the opponent's claim. *Id.* (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553). Instead, the moving party simply may show that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-movant. *Id.* (citation omitted). Nevertheless, in determining whether to grant summary judgment, the court must remember that, "credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.,* 477 U.S. at 255, 106 S.Ct. at 2513.

## Analysis

I. *Miami–Dade County's Motion for Summary Judgment—Count 2 (42 U.S.C. § 1983)*

■ Miami–Dade moves for summary judgment as to Plaintiff's claim for violation of 42 U.S.C. § 1983 on the basis that no material dispute of fact exists to show a violation of the Eighth Amendment for deliberate indifference to Thompson's safety. In order to show a violation of the Eighth Amendment on this basis, Plaintiff must provide sufficient evidence of (1) conditions posing an objectively substantial risk of serious harm; (2) the county's deliberate indifference to that risk; and (3) causation. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Carter v. Galloway,* 352 F.3d 1346, 1349 (11th Cir.2003) (citing *Hale v. Tallapoosa County,* 50 F.3d 1579, 1582 (11th Cir.1995)).

In *Farmer,* the Supreme Court described the first two elements that a Plaintiff must prove in order to make out this claim:

[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. For a claim ... based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.

The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates

the Eighth Amendment. To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety . . . .

*Farmer*, 511 U.S. at 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (internal quotations and citations omitted). The Court went on to describe the objective test for "deliberate indifference," rejecting a more subjective approach:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .

*Farmer*, 511 U.S. at 837–38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (citations omitted).

The County argues that Plaintiff's claim for violation of the Eighth Amendment fails because he can neither establish that he faced an objectively substantial risk of serious harm at the PTDC, nor that the County or its final policymaker subjectively knew of this risk and knowingly or recklessly disregarded it.

### A. Objectively Substantial Risk of Serious Harm

■ The County argues that there is no dispute of material fact concerning whether Thompson faced an objectively substantial risk of serious harm. Thompson contends that he faced a substantial risk of harm at the PTDC because: (1) he was from Jacksonville, Florida; (2) the cells lacked monitoring devices, such as cameras; and (3) the County's security policy was deficient. Thompson's initial contention that he faced a risk of harm because

he wore a blue jumpsuit, identifying him as being from out of town, is not supported by sufficient record evidence. The affidavit of W. Ken Katsaris, Defendants' expert and a certified Florida Law Enforcement Officer and consultant in Law Enforcement and Corrections, states that there should have been no expectation of physical violence simply because Thompson was from out of town. (Katsaris Aff. ¶ 1). Even Plaintiff's expert, Thomas Rosazza, stated at his deposition that he did not recall another case where an inmate claimed he was assaulted because he wore a different color jumpsuit or because of the results of a football game. (Rosazza Depo. at 62–63). The hearsay statements of the unnamed inmates and/or correctional officers who suggested that Thompson would be at risk are not admissible for the truth of the matter asserted. *See Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 783 (11th Cir.2004) ("Inadmissible hearsay generally cannot be considered on a motion for summary judgment.") (citing *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999)).

■ Regarding Thompson's second contention—that he faced an objectively substantial risk of harm because the cells at the PTDC lacked monitoring devices—the County argues that there is no legal support for a requirement that the PTDC have monitoring devices in the cells. Plaintiff's expert, Rosazza, stated at his deposition that the PTDC is a linear jail and that only between 40 and 60 percent of linear jails have observation monitors in the cells. (Rosazza Depo. at 36:21–23). The portions of Rosazza's deposition that were submitted as record evidence contain no definitive statement that the absence of monitoring cameras would objectively create a substantial risk of harm. Furthermore, the portions of Rosazza's testimony in which he states that the design of the

jail did not allow for officers to hear or see prisoners are inadmissible since he did not visit the PTDC to observe the actual layout. *See supra* note 5. Defendants' expert, Katsaris, stated in his affidavit that the PTDC is in compliance with safety standards for facilities built at the same time and in the same configuration. (Katsaris Aff. ¶ 8).

The Florida Model Jail Standards support the County's argument that the PTDC conditions did not pose an objectively substantial risk of harm to Thompson. The Florida Model Jail Standards do not require cameras. The Standards state only that "[c]orrectional officer posts shall be located to permit officers to hear and respond promptly to calls for help," and that "[t]here shall be sufficient staff on duty so that at all times inmates within the detention facility will be within sight or hearing distance of a correctional officer." (Fla. Model Jail Standards §§ 11.14, 11.16). Thompson has presented no evidence that the officer posts were located so far that officers could not hear calls for help. In fact, Thompson was taken to the medical clinic after officers heard banging in his cell. Although the Florida Model Jail Standards are not a perfect determination of what conditions preclude an objectively substantial risk of harm to inmates, that the PTDC is in compliance with sections 11.14 and 11.16 is unrefuted record evidence that no such risk was posed to Thompson.[6] While Thompson may have been outside the sight of the correctional officers, no record evidence refutes the fact that officers were situated close enough to hear a call for help. The Florida Model Jail Standards state that inmates should be within either sight or hearing distance of the officers. Thompson has not established a genuine dispute of material fact regarding the necessity of monitoring cameras to prevent an objectively substantial risk of harm since officers were situated to hear him should he call out for help.

■ Thompson argues that the deposition testimony of several jail officials regarding violence at the PTDC suggests that Thompson faced an objective risk of harm. These officers testified that there is a lot of fighting in the PTDC that cannot be prevented. (Williams Depo. at 20:15–25; Neal Depo. at 26–27). This testimony does not create a genuine issue of fact as to whether Thompson faced an objectively substantial risk of harm. The testimony merely suggests that some inmate fights will inevitably occur in prison. If this level of risk met the standard for a violation of the Eighth Amendment then incarceration *per se* would constitute an objectively substantial risk of harm since any prisoner would be at risk for getting into a fight. The deposition testimony of these officers does not satisfy the requirement that an inmate "show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970, 128 L.Ed.2d 811.

■ Thompson's final contention regarding the objectively substantial risk of harm is that the PTDC's security policies were deficient. There is no dispute that

---

**6.** Thompson suggests that officers can hear chatter by inmates in all ten cells per floor, but cannot make out the exact words of all inmates. This is immaterial, since the Jail Standards require only that an officer hear a call for help. Thompson testified at his deposition that he could have gotten an officer's attention by banging on the cell window with a broomstick. (Thompson Depo. at 107:11–

14). Officer Williams testified at his deposition that officers can hear noise from each of the ten cells while stationed at the control booth. (Williams Depo. at 31:13–17). Officers Neal and Armenteros likewise testified that officers can hear banging and yelling from the cells while stationed at the control booth. (Neal Depo. at 23:21–24; Armenteros Depo. at 33:6–18).

the County had a policy at the PTDC regarding visual checks which required visual checks of the inmates every hour between 11:00 p.m. and 6:00 a.m. (County 7.5 Stat. at 4–6). This policy meets the Florida Model Jail Standards. *See* Fla. Model Jail Standards § 11.06 (requiring hourly checks between 11:00 p.m. and 6:00 a.m. and reporting of those checks in a log).

Thompson does not refute the existence of this policy. Instead, Thompson argues that the officers at the PTDC did not actually follow the Miami–Dade County policy of making an hourly walk-through to monitor the cells. Thompson's only evidence that the PTDC did not actually follow policy is his own deposition testimony, in which he stated that he only saw officers do a head count once in the morning, once at around 5:00 p.m., and again at either 6:00, 7:00, or 8:00 p.m. Even accepting his deposition testimony as true, Thompson has presented insufficient evidence to create municipal liability under 42 U.S.C. § 1983.

■ "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory" for the actions of municipal employees. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability under § 1983 only exists when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [municipality's] officers." *Id.* at 690, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611; *see also Quinn v. Monroe County*, 330 F.3d 1320, 1325 (11th Cir.2003) (stating that "municipalities may be held liable for the execution of a governmental policy or custom"); *Davis v. DeKalb County School Dist.*, 233 F.3d 1367, 1375 (11th Cir.2000) ("[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' that is, acts which the

municipality has officially sanctioned or ordered.") (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986)). Thompson has introduced no evidence that the municipality has "officially sanctioned or ordered" the officers at the PTDC to disregard County policy and ignore the requirement that the officers conduct hourly walk-throughs. Accordingly, Thompson has not raised a genuine issue of material fact as to whether he faced an objectively substantial risk of harm. As such, the County is entitled to summary judgment as a matter of law on Count II.

### B. *Deliberate Indifference*

■ Even if Thompson had shown that he faced an objectively substantial risk of harm, the County has shown that no genuine issue of material fact exists as to the County's deliberate indifference to that risk. Under *Farmer*, in order to show that a prison official exhibited deliberate indifference, a plaintiff must demonstrate that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979. The Supreme Court elaborated on the means by which a plaintiff may demonstrate deliberate indifference, stating that "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious...." *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1981 (internal citations and quotations omitted).

■ Of course, *Farmer* concerned a complaint by a prisoner against federal prison officials and not against the government itself. There is an additional hurdle that a plaintiff must overcome in order to assert that a county government is liable under § 1983 for deliberate indifference; the plaintiff must show that the actions of the officials derived from official government action. There are three scenarios in which a municipality may be found liable under § 1983:(1) municipal policy; (2) policymaker action; and (3) custom. *See, e.g., Monell,* 436 U.S. at 694–95, 98 S.Ct. at 2037–38 (explaining municipal liability via the explicit setting of a policy by the government that violates the Constitution); *City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205–06, 103 L.Ed.2d 412 (1989) (explaining municipal liability through a government policy of failing to train employees); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123–30, 108 S.Ct. 915, 924–28, 99 L.Ed.2d 107 (1988) (explaining municipal liability by the actions of a policymaker within the government); *Id.* at 130, 108 S.Ct. at 927–28 (explaining municipal liability via the adoption through a knowing failure to act by a policymaker of actions by his subordinates that are so consistent that they have become "custom").

In the instant case, municipal policy and policymaker actions are not in question. The undisputed record evidence demonstrates that Department policy requires an investigation when an inmate complains that he is in fear for his life. Department policy also requires that an inmate who complains that he is in fear for his life be immediately removed from the cell and reassigned. (Neal Aff. ¶ 12). The Department requires officers to investigate and respond to complaints of assaults involving inmates, and to take appropriate action, including separating inmates, imposing discipline, and/or bringing criminal charges against offenders. (Department Standard Operating Procedure ("DSOP") 11–003). The Miami–Dade DSOP No. 11–003 states that an incident report is to be prepared immediately after an incident and should document events and incidents within jail facilities completely and accurately. (DSOP 11–003 at 4). The stated policy of the County is that "[i]ncidents that result in physical harm or threaten the safety of any person in a facility or the Department or threaten the orderly control and security of a facility will be documented in an incident report and submitted to the appropriate supervisor no later than the conclusion of the tour of duty." (DSOP 11–003 at 2). County policy further requires that immediately following any incident resulting in injury to an inmate, the inmate is to be taken to the medical clinic at the jail for evaluation and treatment. (DSOP 14–001). The County reviews these policies and procedures yearly to make the PTDC safer for both inmates and employees. (Spears Aff. ¶ 8). The express municipal policy thus does not demonstrate deliberate indifference.

■ Record evidence suggests that these County policies were not followed. Thompson thus might argue that the actions of the guards in ignoring his pleas for protective custody constitute municipal "custom." As that term is used by the Supreme Court, Thompson must demonstrate that "a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware." *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 927–28, 99 L.Ed.2d 107 (1988). The Eleventh Circuit has repeatedly stated that "[t]o prove § 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom

or usage' with the force of law." *See Griffin v. City of Opa–Locka,* 261 F.3d 1295, 1308 (11th Cir.2001) (citations omitted); *Brown v. City of Fort Lauderdale,* 923 F.2d 1474, 1481 (11th Cir.1991). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* . . . where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma v. Tuttle,* 471 U.S. 808, 824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

■ Under Eleventh Circuit precedent, Thompson must produce more than his own claims to prove a custom. Thompson has introduced no evidence of other incidents or prisoner complaints. "Requiring a showing of deliberate indifference to a *pattern of unconstitutional conduct* in circumstances where there is no official municipal policy that a plaintiff can point to ensures that the municipality is held liable for its own actions and not the aberrant actions of its employees." *See Kuha v. City of Minnetonka,* 365 F.3d 590, 604 (8th Cir.2003). In other words, to hold the County liable for the actions of County employees in their dealings with Thompson would functionally amount to the creation of *respondeat superior* liability, which the Supreme Court expressly prohibited in *Monell. See Monell,* 436 U.S. at 694, 98 S.Ct. at 2037; *see also St. Louis v. Praprotnik,* 485 U.S. 112, 125 n. 2, 108 S.Ct. 915, 925 n. 2, 99 L.Ed.2d 107 (1988); *Pembaur v. Cincinnati,* 475 U.S. 469, 478–80, 106 S.Ct. 1292, 1297–98, 89 L.Ed.2d 452 (1986). There is no question that Thompson's deposition testimony is disturbing.

His allegations concerning the deviation from policy at the PTDC and the fact that he suffered serious injury while detained there are alarming. However, since Thompson has not demonstrated a custom, even viewing the evidence in the light most favorable to him, he has failed to demonstrate that the County may be held liable. The County has shown that it is entitled to summary judgment as a matter of law as to Count II.[7]

II. *Miami–Dade County's Motion for Summary Judgment—Count III (Negligent Supervision)*

■ The County moves for summary judgment as to Count III of the Amended Complaint, which alleges that the County was negligent in supervising inmates at the PTDC because it did not have electronic surveillance in the inmates' cells. The County argues, as with respect to Count II, that there is simply no evidence on record that the County was negligent in failing to install electronic surveillance. Plaintiff argues that the County knew or had reason to anticipate that harm would ensue and failed to use reasonable care to prevent the harm. Whether the County had a duty to install monitoring devices is a question of law. *See Weissman v. Boating Magazine,* 946 F.2d 811, 814 (11th Cir.1991).

The only authority cited by the Plaintiff for the proposition that the County committed negligent supervision is *Parker v. State,* 282 So.2d 483 (La.1973). Initially, it is important to note that this claim is brought under Florida common law and not the Louisiana statute at issue in *Parker.* Nevertheless, *Parker* stands for precisely the *opposite* proposition for which it is cited by Plaintiff. In *Parker,* the inmate

---

7. Plaintiff's Motion for Summary Judgment is essentially a restatement of his opposition to Defendants' Motion for Summary Judgment.

Because the County's Motion is granted, Plaintiff's Motion is denied.

brought suit against Louisiana after he repeatedly told corrections officers at the State Penitentiary that he feared attack by an assailant and was then attacked. *Id.* at 485–86. The court rejected the claim that the State was negligent in failing to protect the plaintiff from attack by another inmate, failing to have an adequate security system, and failing to isolate the plaintiff from his attacker. *Id.* at 486–87. The court noted that the notice provided by the plaintiff to the prison was insufficient since "scores of reports of this kind are received weekly in the prison environment." *Id.* at 486. Finally, the court found that the measures taken by the prison to prevent inmate violence were sufficient; these included periodic searches for weapons, routine security, and talking to the inmate. *Id.* The court concluded that the prison's failure to isolate the inmate did not constitute negligence as a matter of law and that some fighting in prison is inevitable. *Id.*

As I have already explained, the Plaintiff introduced no evidence that the County had a duty to install cameras or other monitoring devices in the cells. Even Plaintiff's own expert testified that jail standards do not require cameras to be placed in every cell and that only about half of all linear jails have cameras in the cells. (Rosazza Depo. at 36, 48). Accordingly, the County is entitled to summary judgment as to Count III.

### III. *Miami–Dade County's Motion for Summary Judgment—Count IV (Negligent Infliction of Emotional Distress)*

The County moves for summary judgment on Count IV by arguing that Plaintiff cannot state a claim for negligent infliction of emotional distress against the County since other inmates inflicted the injuries upon him.

■■■ The facts of this case do not fit the claim of negligent infliction of emotion-

al distress as that claim is defined under Florida law. The Florida Supreme Court has described the four elements required to allege a cause of action for negligent infliction of emotional distress: (1) the plaintiff must suffer a physical injury; (2) the plaintiff's physical injury must be caused by the psychological trauma; (3) the plaintiff must be involved in some way in the event causing the negligent injury to another; and (4) the plaintiff must have a close personal relationship to the directly injured person. *Zell v. Meek,* 665 So.2d 1048, 1054 (Fla.1995). The typical scenario under which such a claim is brought is when a family member suffers psychic trauma after witnessing at close range the death or serious injury of a relative. *See, e.g., Champion v. Gray,* 478 So.2d 17 (Fla. 1985) (mother suffered psychic trauma after witnessing death of daughter in car accident).

■■■ Plaintiff's allegations in his Complaint concern the County's negligence— not negligent infliction of emotional distress. First, Plaintiff has introduced no evidence that his physical injuries were caused by psychological trauma. Second, Plaintiff's claims concern injury to himself, not to another. Accordingly, the County is entitled to summary judgment as a matter of law with regard to Count IV.

### IV. *Spears' Motion for Summary Judgment: Count I (42 U.S.C. § 1983)*

Lois Spears moves for summary judgment as to Count I on the basis that qualified immunity protects her from suit. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno,* 334 F.3d 991, 994 (11th Cir.2003) (quoting *Hope v.*

*Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002)). "Qualified immunity 'protect[s] from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Id.* (quoting *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002)).

To receive qualified immunity, the government official must first prove that she was acting within her discretionary authority. *Id.* (citing *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir.2002)). In this case, it is undisputed that Spears was acting within her discretionary authority as the director of the Department at the time of the incidents alleged in the lawsuit.

"Once the government official has established that she was acting within her discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate." *Id.* The Supreme Court has set forth a two part analysis for determining whether qualified immunity is appropriate. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). The court must first ask the threshold question whether the facts alleged, taken in the light most favorable to the plaintiff, show that the government official's conduct violated a constitutional right. *Id.* If the complaint alleges the violation of a constitutional right, the court must determine whether that right was clearly established at the time of the violation. *Id.*

Thompson argues that Spears violated his Eighth Amendment right to be free from cruel and unusual punishment. As previously stated with respect to the County's § 1983 liability, Thompson must provide sufficient evidence of (1) conditions posing an objectively substantial risk of serious harm; (2) deliberate indifference to that risk; and (3) causation. *See Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977 (1994). Since Thompson has not shown conditions posing an objectively substantial

risk of serious harm, his claim fails against Spears as it does against the County.

■ Spears is likewise entitled to summary judgment based upon Thompson's complete failure to introduce evidence that Spears was deliberately indifferent. Thompson has introduced no evidence that Spears was subjectively aware that Thompson faced a substantial risk of serious harm. She never spoke to Plaintiff and never reviewed any grievance made by him. In fact, there is no evidence of Spears' personal involvement with Plaintiff at any time during his incarceration at the PTDC.

Thompson argues that Spears should be liable by virtue of the fact that the risk to him should have been obvious to Spears. Thompson asserts that the deposition testimony of the correctional officers that fighting was a frequent occurrence at the PTDC is evidence that creates a material dispute of fact about Spears' deliberate indifference. As legal support, Thompson cites the statement of Justice Souter that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious...." *Farmer,* 511 U.S. at 842, 114 S.Ct. at 1981 (internal citations and quotations omitted). This quote from the majority opinion in *Farmer* is somewhat misleading. The Court stated clearly that "we cannot accept petitioner's argument that ... a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it." *Id.,* 511 U.S. at 836–37, 841–42, 114 S.Ct. 1970, 128 L.Ed.2d 811. Evidence that a risk was obvious is only circumstantial evidence that a prison official knew of a risk. *See id.,* 511 U.S. at 842, 114 S.Ct. at 1981 ("[I]f the risk is obvious, so that a reasonable man would

realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of.") (quoting 1 W. LaFave & A. Scott, Substantive Criminal Law §§ 3.7, p. 335 (1986)). The Court clarified the type of evidence a plaintiff must present to show deliberate indifference through an obvious risk: "For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer*, 511 U.S. at 843, 114 S.Ct. 1970, 128 L.Ed.2d 811 (citation and quotations omitted).

Thompson has presented no evidence of a longstanding and well-documented risk of inmate attacks, nor has he presented evidence that Spears was exposed to information concerning the risk. Her affidavit describes the various measures the Department took during her tenure to prevent inmate violence and ensure inmate safety and does not suggest that Spears was aware of a remaining substantial risk following the implementation of those measures. (Spears Aff. ¶ 8). Plaintiff did not submit any evidence concerning Spears' knowledge or exposure to information concerning violence, such as deposition testimony on this subject or internal Department memoranda discussing inmate violence. These are the types of evidence a plaintiff must have to create a material dispute of fact about a prison official's deliberate indifference under *Farmer*. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of [cruel and unusual] punishment." *Id.* at 838, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811. Accordingly, Spears is entitled to summary judgment as to Count I.

It is hereby **ORDERED AND ADJUDGED** that:

1. Defendant Miami–Dade County's Motion for Summary Judgment [**DE** 44] is GRANTED.

2. Defendant Lois Spears' Motion for Summary Judgment [**DE** 41] is GRANTED.

3. Plaintiff Keith L. Thompson's Motion for Summary Judgment [**DE** 49] is DENIED.

4. Miami–Dade County and Lois Spears' Motion in Limine [**DE** 58] is GRANTED.